UNITED STATES of America,
Plaintiff-Appellee,

v.

Murray Bowman BROWN,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Murray Bowman BROWN, a/k/a Bowman Brown, Defendant-Appellant.
(Two Cases)

Nos. 85–5561(L), 86–5595 and 86–5637.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1987.

Decided June 29, 1987.
Rehearing and Rehearing En Banc
Denied July 24, 1987.

Alvin Jeffrey Hammer, Columbia, S.C. (Gedney M. Howe, III, Charleston, S.C., Arthur G. Howe, on brief), for defendant-appellant.

Cameron Bruce Littlejohn, Jr., Asst. U.S. Atty., Columbia, S.C. (Vinton D. Lide, U.S. Atty., Robert C. Jendron, Jr., on brief), for plaintiff-appellee.

Before WINTER, Chief Judge, and WIDENER, and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

Murray Bowman Brown was charged with drug smuggling and tax evasion. A trial was scheduled for January of 1985. Brown entered the hospital shortly before the trial date and was therefore granted a continuance. After granting further continuances, the district court held a hearing in November on Brown's ability to stand trial. The district court concluded that Brown was healthy enough to stand trial and participate in his defense. In June of 1986, after receiving more continuances, Brown entered a conditional guilty plea, reserving the right to appeal the issue of his ability to stand trial. In August, Brown was sentenced.

Brown contends on appeal that the district court erred in denying him an additional continuance on account of his health and that the district court denied him the right to allocution at his sentencing. Finding no merit in these contentions, we affirm.

## I.

Following the continuance of his first trial date in January of 1985, Brown entered the United States Medical Center in Springfield, Missouri, for a thirty day examination. Brown's examination took place from late July until late August. The doctors who examined him concluded that, although Brown was an overweight man in his sixties who suffered from a number of ailments, his physical and mental condition were good enough for him to stand trial.

The district court scheduled a hearing on Brown's health for September 27. Brown requested and was granted a postponement of the hearing on the ground that his attorney needed additional time to review the Center's report and to consult with local physicians.

The hearing took place on November 1. Five doctors from the Center testified. The district court also had before it extensive medical reports from the defendant and the prosecution. After hearing the testimony and reviewing the medical records, the court determined that Brown suffered from high blood pressure and had previously suffered a number of small strokes, but that these conditions would not prevent him from participating in his trial. The court noted that Brown's health improved markedly in the controlled setting of the Center, where his diet and medication were supervised. The court also noted evidence that Brown had exaggerated his mental problems.

A second trial date of January 6, 1986 was set for Brown. Some of his codefendants were to be tried on the same date. He moved for a severance based on antagonistic defenses. This motion was granted; the trial of his codefendants proceeded.

Another trial date was set for March 10. Brown again moved for a continuance due to ill health. The district court granted this motion, ordering Brown to submit weekly medical reports. On May 21, the court held another hearing on Brown's condition. Brown was found capable of standing trial and a trial date was set for June 2. The district court stated that it would accept further medical reports up to and including the date of the trial. Also, the court told Brown's attorney that it would attempt to protect Brown's health from the stress of the trial:

> Now, I would advise you, Mr. Hammer, that you should ... coordinate it with the U.S. attorney's office and with my office, if it's necessary ... to have Mr. Brown's doctor available.
>
> If you feel that any special limitations are in order to the length of time we would run every day, breaks that we should take, et cetera, I will be glad to

hear from you concerning that. I will do everything within my power to make this trial as uneventful physically, emotionally, and from a stress standpoint on Mr. Brown as is humanly possible.

On June 2, Brown entered a conditional plea of guilty pursuant to Fed.R.Crim.P. 11(a)(2). He pled guilty to importing 35,000 pounds of marijuana, conspiring to import marijuana, and evading income taxes. He reserved the right to argue on appeal that he was not healthy enough to participate in a trial.

Brown was given a ten year prison term and a ten year term of special parole and was fined $40,000. The court imposed the prison term under 18 U.S.C. § 4205(b)(2) so that the U.S. Parole Commission could grant him parole at any time.

## II.

Brown argues that the district court erred in refusing to grant another continuance beyond the June 2 trial date. A district court's decision to deny a motion for a continuance can be reversed on appeal only for an abuse of discretion. *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983); *Latham v. Crofters, Inc.*, 492 F.2d 913, 915 (4th Cir. 1974). *See also Bernstein v. Travia*, 495 F.2d 1180, 1182 (2d Cir.1974); *United States v. Costello*, 760 F.2d 1123, 1129 (11th Cir.1985). We do not review the medical information before the district court *de novo;* instead, we look to see whether the district court had sufficient evidence before it to support its decision. We hold that the district court did not abuse its discretion in denying the continuance in this case.[1]

■ Whether a defendant's physical condition requires a continuance can be difficult for a trial judge to determine. Medical forecasts are uncertain, and the evidence before the judge will rarely point in just one direction. The judge must assess the degree to which a defendant's health might impair his participation in his defense, especially his right to be present at trial, to testify on his own behalf, and to confront adverse witnesses. If the judge determines that the proceeding is likely to worsen the defendant's condition, that too is relevant. Among the factors that the trial judge may properly consider are the medical evidence, the defendant's activities in the courtroom and outside of it, the steps the court can take to reduce the medical risks, and the steps that defendant himself is or is not taking to improve his condition. *See, e.g., United States v. Goldstein*, 633 F.Supp. 424, 427 (S.D.Fla.1986).

■ A trial, however, will often produce anxiety on the part of those involved, not least on the defendant himself. For a denial of a continuance to constitute an abuse of discretion, the medical repercussions must be serious and out of the ordinary; the impending trial must pose a substantial danger to a defendant's life or health. *Latham, supra; see also United States v. Daly*, 716 F.2d 1499, 1511 (9th Cir.1983). The fact that the event is by its nature ordealistic cannot abrogate the public interest in bringing those accused of criminal misconduct promptly to account.

More than sufficient evidence supported the conclusion that Brown was capable of standing trial.[2] The court had before it the reports of the personnel at the U.S. Medical Center in Springfield, where Brown had been observed for thirty days. The court also heard testimony for a full day from doctors at the Center who were familiar with Brown's condition through medical re-

---

**1.** We do not accept the government's contention that Brown has waived his right to appeal this issue.

**2.** This case therefore differs from *Latham, supra,* in which we reversed a denial of a continuance where *all* the evidence supported the likelihood that a trial would severely threaten the defendant's health.

*Latham* was a civil case rather than a criminal case. The opinion indicated that a criminal case allows "more chance for a defendant to assert that the denial of a continuance violates a constitutional right than in a civil case." We also made clear, however, that our precedents governing continuances in criminal cases "set forth the same basic rules of discretion in the district court as is applicable in civil litigation." 492 F.2d at 914 n. 2.

ports and in some instances through personal observation. Dr. Richard Joseph D'Andrea, a psychologist at the Center, stated that Brown had exaggerated his emotional instability and that he was competent to go to trial and assist his counsel. Dr. Donald R. Butts, a psychiatrist, stated the same conclusion; "there was no strong evidence at all that he was impaired with an organic brain disease such as senility, Alzheimer's, post-stroke, anything of that nature." Dr. D'Andrea and Dr. Butts testified that they based their conclusions on observation and clinical testing. Dr. Donald Milton Lieberwitz, an osteopath, stated that Brown's blood pressure readings were "in a very good range" for a man of his weight. Dr. Karl Albaeck, a neurosurgeon, stated that Brown's tests indicated no organic brain damage.

Brown submitted material from other physicians who stated that he should not stand trial. These physicians stated that the stress of a trial would aggravate Brown's hypertension, diabetes, and heart disease to a dangerous extent; they also stated that Brown lacked the ability to concentrate on trial proceedings sufficiently to comprehend them. The court put greater weight on the Medical Center information than on these reports because the Medical Center had observed Brown "during the course of [a] prolonged structured treatment of the Defendant." A report from one of Brown's physicians (Dr. Fisher) was termed "rather cursory"; a report from another of his physicians (Dr. Grossman) was termed "the most tentative report this Court has ever seen."

■ In addition to information presented by numerous doctors, the court also referred to its own observation of Brown at various pretrial proceedings. It was entirely proper, of course, for the court to consider its observations of the defendant's activity and alertness in ascertaining his physical and mental capabilities. *United States v. Silverthorne*, 430 F.2d 675, 677 (9th Cir. 1970). The court stated that Brown had displayed a clear understanding of the nature of the charges contained in the indictment, that Brown and his counsel had fre-

quently conferred during pretrial proceedings, and that the court had witnessed nothing to suggest that he would be "unable to properly and adequately assist his lawyers in the defense of this case."

Finally, as noted earlier, the court told defense counsel that it would take whatever measures necessary to protect Brown's health at trial, such as having a physician present and scheduling breaks. The availability of such measures is an important consideration in determining whether a trial would impair defendant's health or impair his ability to participate in his defense. *Bernstein, supra; Goldstein, supra; United States v. Mosley*, 500 F.Supp. 601, 605 (N.D.N.Y.1980).

The facts of this case illustrate perfectly the basis of appellate deference to trial judges in determining whether to grant a continuance on grounds of physical or emotional distress. Conflicting medical evidence, including live testimony, was presented for the trial judge to resolve. The trial judge listened to the doctors and considered his perceptions of the defendant in the courtroom. He monitored defendant's medical condition on a regular basis until the time of trial. He possessed the critical first-hand impressions that we lack. *Cf. Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

Other circuits have deferred to the findings of trial courts in circumstances where the defendant's health was impaired to a far greater extent than Brown alleges his is. In *Costello, supra,* the appellate court upheld the trial court's refusal to continue a sentencing hearing, even though the defendant had attempted suicide that morning and had been treated with Valium and was acting as his own counsel. In *Bernstein, supra,* the appellate court upheld the trial court's refusal to continue a trial of a defendant whose previous myocardial infarction and present symptoms of angina pectoris made him especially vulnerable to a heart attack. Without expressing an opinion as to how we would rule in such cases, we think it helpful as a matter of

perspective to note that Brown's situation is less serious.

## III.

■ The district judge had to weigh in this case the conflicting testimony of various physicians, as well as his own observations. Where a district judge must weigh such conflicting evidence in deciding a motion for a continuance, we think it would be extremely unwise to attempt to prescribe specific evidentiary rules for the judge to follow. In particular, we reject the various rules suggested by the dissent in this case.

The dissent faults the district judge for placing insufficient weight on the testimony of Brown's personal physician. On the contrary, a district judge's discretion in these matters properly includes the power to discount such testimony. He might find a treating physician's testimony unpersuasive because he lacks confidence in the physician's qualifications or abilities. The trial judge must also weigh, implicitly or explicitly, a treating physician's candor and objectivity. These are classic credibility questions which the district court is better able to resolve than the dissent.[3]

The dissent cites decisions in which we found inadequate weight was given to a treating physician's testimony. Those decisions involved the weighing of evidence by administrative law judges in cases involving disability benefits. Even at the administrative level, a treating physician's conclusions are not dispositive. 20 C.F.R. § 404.1527. In any event, rules developed by appellate courts in limiting the discretion of administrative law judges and ad-

ministrative agencies—rules motivated in part by concerns about agency independence and bias—have little or no relevance to the exercise of discretion by a district court. See J. Mashaw, Bureaucratic Justice 41–44 (1983); Note, Administrative Law Judges, Performance Evaluation, and Productions Standards: Judicial Independence Versus Employee Accountability, 54 Geo.Wash.L.Rev. 591, 617–18 (1986).

After criticizing the district judge for giving too little weight to the testimony of Brown's physicians, the dissent criticizes the judge for giving too much weight to the thirty-day examination in Springfield and to his own observations. It is true, as the dissent points out, that the Springfield examination addresses Brown's condition as of August 1985, not as of the date of the last competency hearing or the scheduled trial date. This does not mean the judge had to disregard it, however. The judge was informed that Brown had suffered from the same health problems in varying degrees since the 1970's. Moreover, a considerable delay will almost always occur between a physical examination and a court appearance. This is especially true where, as here, the defendant himself has sought and received postponements after the physical examination.

The dissent's implication that the thirty-day examination in Springfield was limited to Brown's mental status is simply incorrect. The record shows that the examination and the subsequent testimony of the Springfield doctors covered Brown's physical status as well. According to the final report concerning his examination, Brown

---

3. The dissent also contends that the district judge believed he was obligated to try Brown no matter how severe his health problems. This contention is as unsupportable as it is implausible. The record plainly shows that the district judge understood the question before him— whether Brown was mentally and physically able to stand trial—and understood that if Brown could not stand trial a further continuance would be necessary. For example, in the following colloquy with defense counsel, the judge acknowledged that Brown might never go to trial if his health were bad enough:

The Court: [W]hen does the medical evidence indicate Mr. Brown will be able to go to trial?

Mr. Howe: Maybe never. But that's not my problem.

The Court: I understand that's my problem.

Shortly afterward, the judge pointed out all the evidence he had before him that contradicted the reports of Brown's doctors. As the dissent notes, the judge found that Brown suffered from a number of ailments; he also found, however, that these ailments were not so serious as to prevent him from standing trial. Nothing in the record indicates that the judge fully accepted the testimony of Brown's doctors or that the judge misunderstood the issue before him.

"had a History and Physical, a chemistry panel, a serology, a complete blood count, complete urinalysis, and a chest X-ray. He also had several brain scan evaluations, CT scan of the abdomen, electrocardiograms and EEG." Dr. Lieberwitz of the Springfield staff prepared a thorough report on Brown's physical health.

That report and the subsequent testimony of the Springfield doctors presented the district court with a detailed picture of Brown's health. Of course, while the dissent calls for scrutiny of how much the Springfield doctors investigated Brown's physical condition and whether Brown's ailments came within their particular specialties, it declines to apply any such scrutiny to the doctors testifying on behalf of Brown. The dissent's eagerness to discredit Brown's evaluation at the Springfield Center on any imaginable basis (too controlled, too specialized, too out-of-date, and so forth) undercuts a procedure whose thoroughness is to be commended, not condemned.

Finally, as to the judge's reliance on his own observations of Brown, the dissent correctly notes that Brown was absent from the hearing on November 1, 1985. Brown was present before the same judge, however, at numerous earlier proceedings. Brown was also present at the January 6, 1986 hearing. The record does not disclose whether he was present at the May 21, 1986 hearing. In any event, the decision of the trial judge was amply supported by the evidence.

### IV.

■ Brown also argues that he was denied his right of allocution under Fed.R. Crim.P. 32(a)(1)—that is, his right to present information on his own behalf at sentencing—because the trial judge stated that he had already made up his mind about the extent of Brown's role in the drug smuggling conspiracy. We hold that the judge complied with the rule.

Fed.R.Crim.P. 32(a)(1)(B) requires the judge, before imposing sentence, to "afford counsel an opportunity to speak on behalf of the defendant." Fed.R.Crim.P. 32(a)(1)(C) requires the judge to "address the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of punishment." The judge did both.

When Brown's attorney was asked to speak, he objected to a number of passages in the presentence report that he felt exaggerated Brown's role in the drug conspiracy. The judge ordered that these objections be noted in the report. The judge then added that he agreed with the facts presented in the report by the probation officer. During a colloquy between the judge and defense counsel regarding Brown's role, the judge explained that he had made up his mind based on Brown's plea and on two criminal trials involving other defendants in the conspiracy.

The judge then invited Brown to offer information on his behalf. The judge continued to make clear, however, that he concurred with the facts presented in the report:

> [H]aving sat through two trials in this matter, having taken numerous pleas, having heard of your involvement to everything from recruiting police officers to going to Alabama to buy a shrimping vessel to be used in this operation, I just find it unworthy of belief to conclude that your role in this thing was as minimal as you and/or your counsel would have me believe.

The judge was well informed on the nature of Brown's criminal involvement. The requirements of Fed.R.Crim.P. 32(a)(1)(B) and 32(a)(1)(C) were fully discharged when the judge invited the defendant and his attorney to present any information they wanted on the defendant's behalf. Fed.R. Crim.P. 32 does not require the judge to agree with what they said.

The judgment of the district court is therefore

AFFIRMED.

HARRISON L. WINTER, Chief Judge, dissenting:

Unquestionably, Murray Bowman Brown currently suffers from a variety of serious

health problems, including heart and lung disease, hypertension, diabetes and an ulcer—all of which may render the prospect of proceeding to trial an extremely risky proposition. In August 1985, Brown was sent to the Springfield Medical Center for an evaluation of his mental competence to be tried. After thirty days, the doctors there concluded that Brown was mentally competent to stand trial. Unfortunately, the evaluation furnished little insight into Brown's principal physical ailments or the consequences that would likely attend the ordeal of a trial. Moreover, it was limited to information about Brown's condition at the time of the examination. For the subsequent period, uncontradicted evidence from Brown's treating physicians establishes that his condition has deteriorated markedly since August 1985, to the point where subjecting Brown to trial would pose a substantial risk to his life and health.

Despite the evidence of Brown's deteriorating condition, the majority opinion relies primarily on the outdated Springfield report in affirming the denial of Brown's motion for a continuance on the grounds of ill health. The majority also relies upon the district court's observations of Brown at several earlier proceedings, notwithstanding Brown's absence from his own competency hearing in November 1985—an absence necessitated by his recent hospitalization, but which the district court deemed insufficient to justify postponing the competency determination.

At the May 1986 status conference, convened for the purpose of assessing Brown's health, the district court denied Brown's renewed motion for a continuance, and scheduled trial for June 2. The court found that Brown's physical and mental impairments did not preclude him from adequately assisting his counsel at trial. There was, however, no finding that subjecting Brown to trial would not pose a

serious risk to his life and health—Brown's principal basis for seeking a continuance. The court conceded that Brown's condition would "probably get progressively worse," and concluded therefrom that "defendant will have to be tried as soon as. possible."

Because I conclude that Brown should not have been forced to trial when the evidence established that to do so would gravely threaten his health and survival, I respectfully dissent. I find it unnecessary to consider Brown's claimed denial of his right of allocution.

## I.

My resolution of the merits necessitates an expression of view about the government's contention that, by entering a conditional plea of guilty pursuant to F.R. Crim.P. 11(a)(2), Brown waived his right to challenge the denial of his motion for a continuance. In light of the recent amendment to Rule 11, I reject the government's contention.

The 1983 Amendment to Rule 11 explicitly authorizes the use of conditional pleas. "With the approval of the court and the consent of the government," a defendant may enter a plea of guilty that is conditioned upon the right to appeal an adverse pretrial ruling.[4] Nothing in the Amendment or the accompanying Advisory Committee Note suggests that it is limited to any particular type of pretrial ruling. To the contrary, the Advisory Committee made clear that the Amendment was intentionally broad in scope and was designed to avoid the futility and waste of insisting upon full trials for the sole purpose of preserving appellate review of pretrial issues. Indeed, it would be particularly anomalous to require a defendant like Brown to subject himself to trial when the very issue he seeks to appeal is his inability effectively to participate in, and physically survive, the rigors of such a proceeding.[5]

---

**4.** The full text of F.R.Crim.P. 11(a)(2) provides:
(2) **Conditional Pleas.** With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any

specified pretrial motion. If the defendant prevails on appeal, he shall be allowed to withdraw his plea.

**5.** The cases cited by the government predate the 1983 Amendment, and hold only that *uncondi-*

Although the district court indicated its belief that Brown probably could not appeal the denial of the continuance without actually subjecting himself to trial, it nonetheless expressly consented to the entry of the conditional plea. While the government did not make its consent so explicit, it sufficiently manifested such consent by submitting for court approval the written plea agreement, in which the condition was clearly set forth. *See* Adv.Comm. Note to 1983 Amend. (requirement, under Rule 11(a)(2), that conditional plea be in writing, removes concern that it will be entered without government's "considered acquiescence"). In more pragmatic terms, the government made no objection to the procedure used, and cannot realistically now claim that it did not accept the conditional plea. Accordingly, Brown has, in my view, effectively preserved his right to challenge the decision denying his motion for a continuance.

## II.

As I stated before, the majority relies on two grounds for affirming the district court's denial of Brown's motion: (1) the evidence from physicians at the Springfield Center who observed Brown for thirty days in the summer of 1985, and (2) the district court's own observations of Brown. I address these seriatim.

## A.

The report from the Springfield Center concluded that Brown was "mentally competent to stand trial." Consistent with the limited statutory basis for the examination (to determine mental competency to be tried, 18 U.S.C. § 4241), the report spoke principally about his mental and intellectual capabilities. Much of the report and related testimony had no bearing on the potential detriment to his physical health that would result from subjecting Brown to a trial.[6] Nor did it provide much insight into how Brown could cope with the extended stress and fatigue from a long trial, in terms of his ability to assist his attorneys. As the district court emphasized, these doctors were evaluating Brown in a very controlled and structured environment—four weeks under close supervision. Although the district court and the majority opinion rely on this factor to discount the testimony of Dr. Fisher, one of Brown's two regular physicians, I think this was error. Brown's condition in a closely controlled setting, removed from many everyday stresses, is hardly indicative of what his condition would likely be in the midst of a prolonged trial. Moreover, we have previously expressed our belief in the heightened value to be placed on the testimony of a treating physician. *See Leonard v. Schweiker*, 724 F.2d 1076, 1078 (4 Cir.1983) (social security context); *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4 Cir.1983) ("the opinion of a claimant's treating physician ... is entitled to great weight for it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time").[7]

*tional* guilty pleas usually constitute a waiver of nonjurisdictional defects.

**6.** The majority notes that the Springfield examination was not limited strictly to Brown's mental status. It is true that, while Brown was at the Medical Center, a series of physical tests was also conducted. However, the results of those tests had no bearing on the report that was being prepared for the court, nor did they include any prediction of the likely consequences of a trial on Brown's physical well-being.

The sole basis for Brown's commitment to the Springfield Center, and thus for the Center's report to the court, was to obtain an assessment of his mental competency to stand trial, as authorized by 18 U.S.C. § 4241. Accordingly, the court's ruling after the November 1 "competency hearing" found nothing more than that defendant was "competent," i.e., had the requisite "mental capacity" to stand trial. Indeed, Dr. Lieberwitz, the individual cited by the majority as responsible for preparing the report of Brown's physical examination, made clear that he was simply monitoring Brown's health while Brown was confined at the Center, and that the physical exam was not a part of the necessary evaluation that was being conducted. Dr. Lieberwitz described his report as designed primarily to assist Brown's physicians upon Brown's return home.

**7.** The majority claims that this principle is applicable only to cases involving disability benefits—cases in which the courts have manifested concern for agency independence and objectivity, and a desire to circumscribe the discretion of agencies and ALJs. While this concern un-

The majority properly notes that a district court is free to discount the testimony of physicians—even treating ones—when the court lacks confidence in their qualifications, abilities, candor or objectivity. Had these "classic credibility issues" been the basis for the district court's downplaying of Dr. Fisher's testimony, my conclusion might be different. However, the court explicitly grounded its criticism of that testimony on the fact that Dr. Fisher had not observed Brown in the type of structured treatment setting that was available at Springfield—a setting ill-suited to provide insight into a patient's likely response to the ordeal of a trial. While the district court cryptically referred to Dr. Fisher's report as "rather cursory," there is nothing in the record from the proceedings following this November 1 hearing that suggests any shortcomings in the subsequent, uncontradicted reports and testimony from either Dr. Fisher or Dr. Ball (Brown's other treating physician) regarding Brown's physical ability to withstand a trial.

Most of the testimony concerning the Springfield examination came from non-treating doctors who specialized in fields unrelated to Brown's principal medical problems—the latter including diabetes, hypertension, heart disease, lung disease and the many adverse side effects of Brown's daily medications. Of the four individuals cited in the majority opinion, three had largely unrelated specialities, and their testimony was generally confined to those specialities: psychologist D'Andrea testified about Brown's immediate memory and emotional stability; psychiatrist Butts and neurosurgeon Albaeck testified regarding the possibility of organic brain damage. Dr. Lieberwitz, an osteopath, did testify about Brown's hypertension, but merely

described Brown's blood pressure in August 1985; he did not consider the anticipated impact of a long and stressful trial, except to the extent that he acknowledged that emotional stress can result in paroxysmal elevations in pressure.

To my mind, the Springfield report considered alone provides scant support for the conclusion that Brown could physically withstand the stress of a trial. But even if the report is considered to support that conclusion, the most important limitation of both the report and accompanying medical testimony is the fact that the conclusions expressed therein were necessarily valid only as of the time of the Springfield evaluation—August 1985. Both the doctors and the district court conceded as much. This caveat, obvious as it may be, is of critical significance in this case, because the evidence about Brown's physical condition subsequent to August 1985 shows that he was not physically fit to stand trial.[8]

The January 1986 testimony from Brown's two principal treating physicians indicated that Brown's medical condition had worsened over the last several months, and would continue its downward trend. Brown's hospitalization in late October 1985 resulted from a serious decline in his heart function which was only partially alleviated by installation of a pacemaker. The government presented no evidence to counter the post-August 1985 testimony and reports from Brown's physicians, and conceded at oral argument that Brown's condition had deteriorated since the time of the Springfield exam.

Evidence presented by Brown, from his treating physicians, for the time period after August 1985, showed the following:

doubtedly motivates many judicial decisions in the social security context, it has little relevance to the principle cited here. That principle, according special weight to medical assessments rendered by treating physicians, is explicitly justified by the practical recognition that "an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time" is likely to prove more accurate and reliable than a judgment based on an isolated examination or a simple review of medical records. *Mitchell,* 699 F.2d at 187. *See also*

*Martin v. Secretary of Dept. of Health, Ed. & Welf.,* 492 F.2d 905, 907–09 (4 Cir.1974).

**8.** Contrary to the majority's suggestion, I am not arguing that the Springfield report must be disregarded altogether. Its significance, however, is drastically reduced in light of the fact that all medical evidence subsequent to the August 1985 examination demonstrates a marked deterioration in Brown's physical condition.

\* he currently suffers from diabetes, hypertension, anxiety, depression, chronic obstructive and restrictive pulmonary disease, peptic ulcer, arteriosclerotic cardiovascular disease and congestive heart failure, and gout

\* his blood pressure and blood sugar are in poor control, *despite compliance* with his medication regime—a condition that is exacerbated by stress

\* the stress and demands of trial could pose serious, life-threatening risks to Brown, including the very real possibilities of stroke, cardiac decomposition, or death

\* a combination of effects from his illnesses and his numerous medications (necessary to keep him alive) significantly impair Brown's ability to concentrate, remember, and stay awake.

Moreover, the *government* sent Brown to see a cardiologist, Dr. Usher, in April 1985. This doctor concluded that, because Brown's blood pressure was not adequately controlled at the time, "it would be a risk to his health to proceed with trial proceedings." Dr. Usher believed that the problem was remediable, and indicated that trial would be safe *if* Brown's pressure were adequately controlled. However, the re-

ports available immediately prior to the June 2, 1986 hearing show that Brown's physicians had found his blood pressure and sugar to be in poor control, despite compliance with his medication and diet regimes.

To me, it is clear that the prospect of trial posed a substantial danger to the defendant's life or health.[9] Moreover, the combined debilitating effect of his health problems and accompanying medications would have greatly interfered with Brown's ability to comprehend trial proceedings and effectively assist his counsel in his defense.[10]

The district court apparently accepted the post-August 1985 evidence from Brown's physicians; it made clear its belief that Brown's condition had indeed deteriorated, and would continue to worsen. As the court observed during the January 1986 hearing,

[Brown is] never going to be off the medication. The medical evidence indicates the oxygen to his lungs is not going to get better. His cardiovascular disease is going to deteriorate. As the doctors have testified to, the man is never going to get better.[11]

**9.** The majority notes that other appellate courts have upheld denials of continuances in more egregious circumstances. The cases cited in support of that proposition, however, are distinguishable. In *Bernstein v. Travia,* 495 F.2d 1180 (2 Cir.1974), the district court found that the defendant would receive scant benefit from a continuance; he "would suffer a great deal of anxiety, in any event, so long as his wife remained on trial." *Id.* at 1182. Moreover, the government had already put on its "lengthy case," *id.,* thus elevating its stake in completing the trial above that which exists in the present case. In *United States v. Costello,* 760 F.2d 1123 (11 Cir.1985), the defendant made no claim that his participation in the proceeding would pose a risk to his health, but rather only that he was not emotionally or physically up to it, after his suicide attempt earlier that day. Moreover, the proceeding was not a trial but only a sentencing hearing, for which prolonged concentration was not required, and which would not subject him to extended periods of stress and fatigue.

**10.** The district court's willingness to try to accommodate Brown's medical needs is surely commendable. However, that does little to mitigate the stress and fatigue inherent in any trial on the charges pending against Brown. The

fact that Brown's blood pressure and sugar, for example, remain uncontrolled despite compliance with his doctor's orders suggests that there is not much that can be achieved by taking breaks in the trial or adjourning earlier than usual. Indeed, such measures, while possibly helping to reduce daily fatigue, would simultaneously prolong the trial and its attendant stressful impact.

**11.** The majority isolates a paragraph in the January 1986 transcript in which the district court pointed to evidence that ostensibly contradicted the reports of Brown's physicians. That paragraph, however, was a response to defense counsel's claim that, *apart from* Brown's physical ability to survive a trial, he was unable effectively "to participate in his defense.... [and that there was] nothing else [in the record] to contradict that." The court's response focussed solely on this competency issue, noting that Brown had previously demonstrated some ability to consult and communicate with his attorneys. There is no indication of any evidence contradicting the assessment of Brown's *physical* ability to tolerate the stress of a trial. Indeed, immediately prior to the exchange just described, the court made the statement quoted in the text, *supra.*

A few pages later in the January 1986 transcript, the court conceded to defense counsel that

> [t]he one thing you can't address and what troubles this court is medically, he's never going to be any better. In fact, his condition is going to progressively deteriorate, and he's in a better condition to stand trial in January, 1986 than he would be in June of 1986.[12]

Any uncertainty regarding the district court's position is eliminated by examining its ruling at the May 1986 hearing. The court rejected the claims that Brown was either "mentally incompetent ... [or] physically impaired from assisting counsel in the preparation of the trial or in proceeding to trial in the matter." Yet the court unambiguously expressed its recognition of Brown's deteriorating physical health:

> ... I don't have any doubt—I have never had any doubt that Mr. Brown has a series of serious medical conditions.... the consensus of the doctors was that his condition would never improve, that it would probably get progressively worse.

Indeed, the court could hardly conclude otherwise, since the government conceded that it had no evidence to refute the post-August 1985 medical assessments rendered by Brown's treating physicians.

From this premise, the court concluded that Brown must be tried immediately:

> [I]n view of [Brown's] physical condition, in view of the likelihood that it will continue to deteriorate, I think that in his interest and the interest of justice that this defendant will have to be tried as soon as possible.

The court had expressed a similar legal conclusion at the January proceeding: "If he's never going to get any better—if he's as well now as he's ever going to be, doesn't that mitigate in favor of proceeding to trial?"[13] It impliedly assumed that a trial was inevitable, and that the only question was one of timing. The district court does not appear to have considered the possibility that, if going to trial posed a severe health risk to Brown, due process might forever prevent him from being tried.

The second ground asserted by the majority for affirming the district court's decision is the district court's own observations of Brown. Reliance on this factor is particularly ironic since one of Brown's protestations on appeal, which the majority fails to address, is that the district court erred in denying Brown's November 1, 1985 motion for continuance of the competency hearing because of his inability to attend.[14] The district court was thus deprived of those critical first-hand impressions which it had obtained from observation of Brown at earlier pretrial proceedings. This deprivation takes on added importance in light of Brown's claim that his condition had deteriorated considerably during the months following his August 1985 evaluation at the Springfield Center. Indeed, Brown's absence from the November 1 hearing, due to his recent hospitalization, was itself additional evidence of that deterioration of which Brown complained.

I therefore conclude that the district court's denial of the continuance is not sustainable on the basis of its observations of Brown.

### III.

In light of the uncontradicted evidence of Brown's physical condition subsequent to

---

12. Although the court then pointed to some evidence indicating that Brown may have exaggerated problems concerning his memory and attention span, these problems related solely to his capacity to "assist ... adequately in his own defense," and not to his physical ability to survive a trial.

13. The majority correctly observes that this quotation from the January 1986 hearing is premised on the district court's assumption, arguendo, of the facts as portrayed by defense counsel. This observation hardly undercuts my position, since the sole purpose of including the quotation is to expose the district court's erroneous view of the *law*. That the court did accept the reports and testimony of Brown's physicians regarding his deteriorating physical condition is amply demonstrated, *supra*.

14. Although Brown had initially waived his presence at the hearing, his attorney filed a withdrawal of that waiver prior to the hearing on November 1.

the Springfield examination, I can only conclude that the district court erred in denying Brown's motion for a continuance on grounds of ill health.[15] Since I think that this issue was properly preserved by Brown's conditional plea of guilty, I would reverse the judgment of conviction entered on the conditional plea, and remand the case for further proceedings. Unless the government can show a marked improvement in Brown's health at a reasonably foreseeable future date so that he can be retried, the prosecution should be quashed.

---

**15.** The majority characterizes this dissent as "eager" to discredit the Springfield evaluation. Far from it, for I take no comfort in the belief that Brown's plea of guilty was induced by a fear of the health consequences that would have accompanied a decision to stand trial.