Kenneth W. JONES, Appellant,

v.

STATE of Alaska, Appellee.

No. A–3574.

Court of Appeals of Alaska.

May 31, 1991.

---

James H. McComas, Schleuss & McComas, Anchorage, for appellant.

W.H. Hawley, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

COATS, Judge.

Kenneth W. Jones was convicted, following a jury trial, of manslaughter and two counts of assault in the second degree. AS 11.41.120(a)(1); AS 11.41.210(a)(2). Superior Court Judge Charles K. Cranston sentenced Jones to a composite sentence of ten years with three years suspended. Jones appeals his conviction. We affirm.

On July 4, 1985, Jones' five-year-old son Wesley died, and two other children were seriously injured, as a result of a fire in a pick-up truck. In addition to Jones and Wesley, there were four other people riding in the truck that day: Jones' girlfriend, Linda Jones; a friend, Michael Corcoran; Jones' other son, Louis Jones; and Linda's daughter, Camille Castillo. The three adults were sitting in the front seat of the cab, while the three children were sitting in a bench seat behind the seat used by the adults. Jones is alleged to have started the fire by lighting firecrackers inside the truck.

Linda Jones testified at trial that Jones intentionally lit two different sets of firecrackers and threw them toward the driver, Corcoran, in order to scare him. She testified that the second set of fireworks which Jones threw wound up in the back seat area where the children were located, and started a fire. Camille and Louis suffered serious burns in the fire. Wesley died in the hospital from his injuries. Jones was convicted based upon this incident.

█ Jones first contends that the trial court erred by denying his motion to continue his trial due to his medical condition. It is necessary to set out some background information in order to discuss this issue.

On August 14, 1985, the grand jury indicted Jones for one count of manslaughter and two counts of second-degree assault. The court set trial for March 5, 1986. The court released Jones pending trial. During this time, he was suffering from a work-related injury to his back; the injury had occurred in 1984 before the fire incident. After a telephonic hearing with three physicians involved in the treatment of his back, the court ordered Jones not to have surgery prior to trial.

On July 14, 1986, the prosecutor informed defense counsel that she was going to dismiss the case. Two days later, she informed counsel that her office had overruled her decision and had decided to pro-

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

ceed with prosecution. On October 3, 1986, Judge Cranston dismissed the indictment because of the prosecutor's initial promise. After granting the state's petition for review, this court reversed the trial court's order dismissing the indictment and remanded for trial. *State v. Jones*, 751 P.2d 1379 (Alaska App.1988).

On September 27, 1988, Jones had back surgery to treat a lumbosacral disc protrusion. Dr. Jeffrey Bert performed the surgery in Oregon. Trial was originally scheduled for January 4, 1989, but the court granted Jones' unopposed motion for continuance due to his medical condition. The court set a new trial date for May 1, 1989.

On April 10, 1989, defense counsel filed another motion to continue, citing Jones' medical condition and lack of funds to travel from Oregon to Alaska. The state opposed the continuance. The court held a hearing at which Jones and Dr. Bert, his treating surgeon, testified telephonically. In essence, Jones and Dr. Bert testified that Jones' recovery from the back surgery was slow and painful, and his ability to concentrate was impaired by heavy pain medications. The court conditionally granted the continuance, but provided that the state could conduct an independent medical examination. The court set a new trial date for August 14, 1989.

In June, 1989, Jones had another back operation to correct a second rupture that had occurred in the same area as the first operation. On July 5, 1989, defense counsel submitted a motion to continue trial, which was supported by Jones' medical records. On July 24, the court denied the motion. On July 31, Jones filed a motion for reconsideration, claiming that his medications would "significantly hamper the defendant's ability to concentrate and participate in his own defense."

The court held a hearing on August 2, 1989. Dr. Bert testified that he felt, from a medical point of view, that it was not in Jones' best interest to travel. He testified that Jones could not sit for more than thirty to forty minutes safely. He stated that Jones would probably be able to sit and travel in about two months. However, Bert also testified that some of the problems would be alleviated if Jones traveled semi-reclined, and reclined in the courtroom while being able to move around every thirty minutes. He testified that it was acceptable to transport Jones lying down as in a medical transport. Bert also testified that Jones was taking three Tylox pills, a "very strong narcotic pain killer," and fifteen milligrams of valium a day. He stated that these are "powerful drugs [which] certainly would slow one's thought process." The court denied the motion for continuance emphasizing the amount of time the case already had been delayed. Judge Cranston indicated that he had no assurance that Jones would improve in two months.

On August 7, 1989, after Jones had traveled to Alaska, Judge Cranston, *sua sponte*, ordered an independent medical examination to be performed by Dr. Edward Voke, an orthopedic surgeon. The court's order is entitled: "Order for Independent Psychological Examination." The court specifically ordered the examination to address Jones' ability to physically participate in trial, and to participate meaningfully in his defense despite the medications. On August 11, Judge Cranston heard testimony from Voke that Jones was physically capable of standing trial and wanted to stand trial, as long as the court provided Jones with a bed or reclining chair in the court room. Voke also testified that he did not think that Jones' medications would affect his mental ability during trial, and that Jones was mentally alert during the examination. Voke stated that his opinion was from an orthopedic surgeon's point of view, but that it was "hard for me to answer the issue about the mental part ... if it has anything to do with his medication ... but I have no trouble with it."

Trial began on August 22, 1989. During the course of trial, Jones' condition deteriorated so that by September 1, he required immediate hospitalization. Jones' deteriorating condition included loss of bladder function, sexual function, and feeling in his right leg. Jones was hospitalized

in Kenai from September 1 through September 5. The court heard testimony from the hospital's treating surgeon, Dr. George Garnett, on September 5. He testified that Jones should be transported to Anchorage to avoid further loss of nerve function and permanent neurological damage. At that time, Jones was receiving intravenous morphine injections for the pain. Judge Cranston suspended the trial due to Jones' emergency medical condition.

From September 5 through September 8, Jones was hospitalized in Anchorage. The treating physician in Anchorage recommended that Jones return to Oregon, as he would probably need more surgery.

On September 11, 1989, defense counsel expressed concern that Jones would not be able to testify coherently because of the effects of the pain medications. At that time, Jones was taking several prescription narcotics. On September 12, 1989, another hearing was held at which both Dr. Voke and Dr. Garnett testified. Voke testified that during his examination of Jones one month earlier, Jones "was very coherent, very lucid, and so there was no way I could tell, at least by interview, whether he had taken any medication or not." He indicated Jones would be capable of testifying. Garnett testified that the medications could cause Jones to hallucinate, to be disoriented and easily confused.

The court continued the trial until September 18, 1989. Judge Cranston gave Jones a choice: he could either withdraw from the medications and testify, or the court would make a determination whether he was competent and if necessary, declare a mistrial.

Jones had expressed a desire on several occasions to have the trial continue. Before trial resumed on September 18, he was hospitalized for one week to withdraw from the pain medications under medical supervision. On September 18, he was only taking Motrin for the pain. Before he testified, the court inquired as to Jones' state of mind and defense counsel stated that "he seemed to be pretty clear headed." In response to a later inquiry of the court, defense counsel stated: "[H]e is much clearer today than he has been during most of the trial." Following his testimony, Jones then waived his presence for any remaining proceedings and returned to Oregon.

Jones contends that Judge Cranston erred in denying his motion to continue his trial due to his medical condition. In deciding this issue, we find the analysis in *United States v. Brown*, 821 F.2d 986 (4th Cir.1987), and *United States v. Zannino*, 895 F.2d 1 (1st Cir.1990), to be persuasive. In *Brown*, the court stated:

Whether a defendant's physical condition requires a continuance can be difficult for a trial judge to determine. Medical forecasts are uncertain, and the evidence before the judge will rarely point in just one direction. The judge must assess the degree to which a defendant's health might impair his participation in his defense, especially his right to be present at trial, to testify on his own behalf, and to confront adverse witnesses. If the judge determines that the proceeding is likely to worsen the defendant's condition, that too is relevant. Among the factors that the trial judge may properly consider are the medical evidence, the defendant's activities in the courtroom and outside of it, the steps the court can take to reduce the medical risks, and the steps that defendant himself is or is not taking to improve his condition.

A trial, however, will often produce anxiety on the part of those involved, not least on the defendant himself. For a denial of a continuance to constitute an abuse of discretion, the medical repercussions must be serious and out of the ordinary; the impending trial must pose a substantial danger to a defendant's life or health.

*Brown*, 821 F.2d at 988 (citations omitted).

The *Brown* court stated that the appellate court should defer to the trial court's superior ability to determine facts. The court stated:

It was entirely proper, of course, for the court to consider its observations of the defendant's activity and alertness in

ascertaining his physical and mental capabilities.

. . . .

The facts of this case illustrate perfectly the basis of appellate deference to trial judges in determining whether to grant a continuance on grounds of physical or emotional distress. Conflicting medical evidence, including live testimony, was presented for the trial judge to resolve. The trial judge listened to the doctors and considered his perceptions of the defendant in the courtroom. He monitored defendant's medical condition on a regular basis until the time of trial. He possessed the critical first-hand impressions that we lack.

*Id.* at 989 (citations omitted).

In *Zannino*, 895 F.2d at 13, the court stated:

[W]here a continuance request is predicated on medical dangerousness, the judge must be given a relatively wide berth. He has first-hand knowledge of the defendant and his situation, gained over time; he knows the courtroom conditions and the circumstances of trial intimately, and possesses great familiarity with the scope and complexity of the litigable issues; he has the ability to question health care providers and solicit additional opinions; he can best sift overstatement from understatement, eyeing the defendant's and doctors' credibility, and tempering the prosecutors' zeal; and he will usually have developed a "feel" for factors like intensity and stressfulness.

In the instant case, we believe that we must defer to the trial judge's superior opportunity for fact finding. Taking the testimony in the light most favorable to the state, Dr. Bert stated that, from a medical point of view, he did not feel it was in Jones' best interest to travel. However, he did concede that Jones would be able to travel to Alaska if he were lying down, as in a medical transport. There is no question that Jones' case had been delayed a significant period of time, and there was certainly no guarantee that it would be safer for Jones to travel at a later time. We conclude that Judge Cranston did not abuse his discretion in requiring Jones to travel to Alaska to stand trial based upon this testimony. The charges against Jones were serious and had been long delayed. Judge Cranston emphasized these factors in denying the motion for a continuance.

When Jones returned to Alaska, Judge Cranston had him examined by Dr. Voke, an orthopedic surgeon. Voke was familiar with the type of operation that Jones had undergone, was familiar with the sort of pain that Jones would be experiencing, and was familiar with the types of medication that Jones was taking for pain. Again, taking Voke's testimony in the light most favorable to the state, he examined Jones and felt Jones could participate in a trial. He testified that he did not feel that the medication was hindering Jones. Later, Voke amplified on this testimony. He stated that Jones "was very coherent, very lucid, and so there was no way I could tell, at least by interview, whether he had taken any medication or not." In addition, Judge Cranston was able to make his own observations of Jones' ability to function.

Later, when Jones' medical condition worsened, Judge Cranston continued the trial. Jones himself concluded that he did not want a mistrial. Again, Judge Cranston weighed medical testimony before continuing with the trial, and determined that Jones was able to proceed. It appears that Jones and his counsel concurred in this conclusion. We conclude that, based upon this evidence, Judge Cranston did not abuse his discretion in denying a continuance at any point in the proceeding.

■ In a related point, Jones argues that Judge Cranston erred in failing to order, *sua sponte*, a psychiatric examination of Jones under AS 12.47.100. Alaska Statute 12.47.100(a) provides:

*Incompetency to Proceed.* (a) A defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against the defendant or to assist in the defendant's own defense may not be tried, convicted, or sentenced

for the commission of a crime so long as the incapacity exists.

In addition, the statute provides the procedure to determine competency at any time the question arises. The statute establishes the court's *sua sponte* duty to order a psychiatric examination when there is a reasonable cause to believe the defendant may be incompetent.

> (b) When, after arrest and before the imposition of sentence or before the expiration of any period of probation, the attorney general, the prosecuting attorney, or the attorney for the accused has reasonable cause to believe that a person charged with a crime may be presently suffering from a mental disease or defect or is otherwise so mentally incompetent that the accused is unable to understand the proceedings or to properly assist in the accused's own defense, the attorney general, the prosecuting attorney or the attorney for the accused may file a motion for a judicial determination of the mental competency of the accused. Upon that motion or upon a similar motion on behalf of the accused, or *upon its own motion*, the court shall have the accused, whether or not previously admitted to bail, examined by at least one qualified psychiatrist, who shall report to the court concerning the mental condition of the accused.

AS 12.47.100(b) (emphasis added).

Jones argues that the trial court violated the constitutional and statutory requirements by failing to order an examination by at least one qualified psychiatrist.

It *seems reasonable to us that,* given Jones' condition, Judge Cranston had Jones observed by an orthopedic surgeon. Voke was familiar with the type of injury that Jones had, the operation that he had, and the types of medication that he was taking. Voke concluded that Jones was capable of standing trial. Judge Cranston also had information from other physicians who treated Jones, Jones' counsel, and Judge Cranston's personal observations of Jones. Under these circumstances, we do not believe that Judge Cranston was required to order further examinations. We find no error.

■ Jones next argues that Judge Cranston erred in limiting his impeachment of his girlfriend, Linda Jones. Linda Jones testified on behalf of the state. She testified that Jones threw the fireworks intentionally to scare the driver, and that he first announced his intention to her. She specifically denied that he had set the fireworks off accidentally. On cross-examination, counsel tried to elicit an admission from Linda that she had failed to state in her deposition testimony that Jones had told her that he wanted to scare the driver. She responded that she could not remember whether or not she had made the statement. Counsel attempted to refresh Linda's recollection by having her examine the transcript of her deposition testimony. The court refused to take the time it would require for the witness to read the 172–page transcript. Judge Cranston also refused to admit the transcript into evidence. Judge Cranston suggested that Jones refresh Linda's recollection with selected portions of the transcript where it would seem likely she would have made the statements. The state was unwilling to stipulate that Linda's deposition testimony did not contain the statement about Jones' intention.

Jones argues that the court's denial of his ability to impeach this material witness on a crucial matter violated his constitutional rights to due process, compulsory process, and confrontation. Therefore, he argues that the state must establish that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Alternatively, Jones argues that the court's ruling violated A.R.E. 613, and influenced the jury's verdict because he was unable to impeach the witness' credibility. *See Love v. State,* 457 P.2d 622 (Alaska 1969).

The state argues that, under A.R.E. 403, the court acted within its discretion in refusing to allow Linda to read the entire transcript. The state also contends that Jones' right of confrontation was not abridged because alternative methods were available. The state suggests that Jones

could have recalled the witness later, after she had an opportunity to read the transcript, or a third party could have testified that the statement could not be found in the deposition.

We conclude that the trial court could properly determine that reading through the entire transcript would have caused undue delay in the trial, and would have been an inefficient use of the court's time. There were time-saving alternatives available to Jones, such as those suggested by the court during trial or by the state in its brief on appeal. *See* A.R.E. 403. Therefore, Jones was not precluded from impeaching Linda Jones with her prior inconsistent statement. We find no error.

The conviction is AFFIRMED.

MANNHEIMER, J., not participating.