UNITED STATES of America, Appellee,

v.

Ilario M.A. ZANNINO,
Defendant, Appellant.

No. 87–1221.

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1989.

Decided Jan. 10, 1990.

Joseph J. Balliro, with whom Edward J. Romano was on brief for defendant, appellant.

Frank J. Marine, Atty., Dept. of Justice, with whom Ernest Dinisco, Sp. Atty., Dept. of Justice, and Wayne A. Budd, U.S. Atty., were on brief for the United States.

Before BOWNES, BREYER and SELYA, Circuit Judges.

SELYA, Circuit Judge.

In 1983, defendant-appellant Ilario M.A. Zannino, allegedly a predominant figure in the so-called "Patriarca Family" of La Cosa Nostra, was indicted by a federal grand jury. The indictment charged Zannino and several codefendants with conspiring to participate in an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), (d), and with a number of racketeering, loansharking, and gambling violations. The listed predicate acts included two murders and four conspiracies to commit murder. Zannino stood trial after the others,[1] and then, on only three of the original eight counts directed against him. Having been found guilty before a jury and sentenced to a 30–year prison term, he prosecutes this appeal. We affirm.

## I. BACKGROUND

Zannino's indictment grew out of the judicially sanctioned electronic surveillance of apartments at 98 Prince Street and 51 North Margin Street in Boston's North

1. Zannino's codefendants included the five Angiulo brothers (Gennaro, Francesco, Nicolo, Donato, and Michele), and Samuel Granito. Nicolo Angiulo never stood trial; he is now dead. Most of the other codefendants were convicted for their involvement in the affairs of the enterprise (the Patriarca Family) and on various subsidiary counts. Michele Angiulo was acquitted on the racketeering charges, but was convicted of participating in one of the enterprise's illegal gambling businesses. Zannino's appeal was consolidated with the codefendants' appeals for purposes of oral argument only (the briefing being entirely separate).

End.[2] Hidden microphones recorded numerous conversations among various persons, including Zannino and his codefendants, during the period January–May 1981. The FBI monitored the conversations and, in addition, photographed persons entering and leaving the premises. We summarize certain critical data, taking the evidence as the jury could permissibly have found it, viewing the record in the light most congenial to the prosecution, and drawing all reasonable inferences in the government's favor. *See United States v. Ingraham,* 832 F.2d 229, 230 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Cintolo,* 818 F.2d 980, 983 (1st Cir.), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

The evidence indicated that the surveilled premises were used as the headquarters for the operation of prosperous, but illegal, gambling and loansharking businesses. Gennaro Angiulo was at the apex of the criminal pyramid and, as such, was ultimately responsible for the delegation of tasks to others.[3] Zannino was a "Capo Regime"—loosely, a captain—in the Patriarca Family, serving under Angiulo.

From at least the fall of 1980 to late spring of 1981, high stakes poker games were held at North Margin St. Photographic surveillance of the building's outside entrance revealed a regular flow of players coming and going. Intercepted conversations disclosed that the poker games were "owned" by a quinquevirate comprised of Zannino, Angiulo, Granito, Ralph Lamattina, and Nick Giso. Francesco Angiulo served as the operation's accountant. John Cincotti managed the staff, collected the dealers' tips, arranged credit for the gamblers, and collected debts. Zannino was the chief operating officer of the venture, supervising Cincotti, determining player eligibility, and overseeing the debt collection function. Donald Smoot was a poker player to whom the house frequently extended credit.

Zannino was also deeply involved with Angiulo in a loansharking operation.[4] They were often overheard discussing aspects of the business. Among other things, the loansharks furnished venture capital to gamblers. By early 1981, Smoot owed Zannino $14,000. Smoot made interest payments on this debt at the rate of one percent per week ($140), paying the money to Zannino, Cincotti, or Donato Angiulo. When Zannino "assigned" $2,000 of the principal to Dominic Isabella, Smoot began to make hebdomadal interest payments to Isabella at twice the rate. Smoot was well aware that, considering the circumstances, he could be threatened with physical harm or violence if he failed to pay his indebtedness to appellant.

The evidence at trial also implicated Zannino in a barbooth gambling business[5] at the Demosthenes Democratic Social Club in Lowell, Massachusetts during 1980–81. Angiulo oversaw the barbooth operation, with Francesco Angiulo as the accountant, Peter Vulgaropoulus as the manager, and

---

2. The surveillance, which provided the basis for numerous prosecutions, has been much chronicled in opinions of this court. *See, e.g., United States v. Angiulo,* 847 F.2d 956, 960–62 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *United States v. Cintolo,* 818 F.2d 980, 983–89, 1002–03 (1st Cir.), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987). We also note that, prior to trial, Zannino's case itself occasioned two appellate opinions which afford some background as to the indictment's travel. *See United States v. Zannino,* 798 F.2d 544 (1st Cir.1986) (per curiam); *United States v. Zannino,* 761 F.2d 52 (1st Cir. 1985).

3. Henceforth, we shall refer to Gennaro Angiulo as "Angiulo," using first names to describe his brothers.

4. "Loansharking," sometimes called "shylocking," is a term of criminal art which may roughly be defined as the unlawful lending of money at usurious rates of interest, repayment being encouraged by the use (or threatened use) of unorthodox, often violent, collection measures.

5. Barbooth is a fast paced dice game in which one wins or loses by shooting certain combinations of numbers. The house provides the dice, the situs, and the croupier. Typically, 15 to 35 people bet on whether the shooter will throw a winning combination. The house does not bet its own money, but takes a percentage, called a "rake," typically 2½% of each bet.

Vincent Roberto (a/k/a "Fat Vinnie") as an assistant manager. Zannino had a financial interest. Numerous conversations were intercepted in which Zannino, Angiulo, and others discussed the barbooth gambling business, including their stake in it, the profits collected, and the house's extension of credit to bettors. Additional evidence was garnered during a warranted search of the Lowell premises in late 1981.

As previously noted, appellant's case was severed from his codefendants. He was tried on three of the counts against him: two counts of running illegal gambling businesses in violation of 18 U.S.C. § 1955 (relating, respectively, to poker games and barbooth gambling), and a third accusing him of making an extortionate extension of credit to Smoot in violation of 18 U.S.C. § 892(a). Appellant was convicted on all three counts.

In this appeal, he assigns myriad errors. There are four major issues: the use of Smoot's testimony; the admissibility of the tape-recorded conversations; sufficiency of the evidence; and defendant's flagship claim—that his ill health required more solicitous treatment than was received. We address these in the indicated order, touch briefly upon a few other arguments, and summarily reject the rest.

## II. A DEAD MAN'S TALE

Smoot, a cooperating government witness, had been placed in the witness protection program and testified at the trial of Zannino's codefendants. On that occasion, he was vigorously cross-examined by three different defense counsel. He died prior to appellant's trial. Appellant mounts a two-pronged challenge to the judge's ruling that Smoot's earlier testimony could be introduced.

### A. *The Confrontation Clause.*

Zannino first contends that reading Smoot's previous testimony to his jury violated the Confrontation Clause, U.S. Const. Amend. VI. To be sure, the Constitution prohibits the random admission into evidence of an unavailable declarant's hearsay statements. Yet, we know on the best authority that such out-of-court statements may nonetheless be admitted at a criminal trial in a variety of circumstances. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 183–84, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987) (coconspirator statements); *Dutton v. Evans,* 400 U.S. 74, 88–89, 91 S.Ct. 210, 219–20, 27 L.Ed.2d 213 (1970) (statement against penal interest); *see also United States v. Seeley,* 892 F.2d 1, 2 (1st Cir.1989); *United States v. Fields,* 871 F.2d 188, 192–93 (1st Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989); *United States v. Dunn,* 758 F.2d 30, 39 (1st Cir.1985).

The touchstone is trustworthiness. When a declarant's unavailability has been shown, the Confrontation Clause may be satisfied if the declaration bears adequate "indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Put in constitutional context, "the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement' ". *Dutton,* 400 U.S. at 89, 91 S.Ct. at 220 (quoting *California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970)). Thus, the requirements of the Confrontation Clause regarding the admission of hearsay evidence are met whenever the evidence falls within a firmly rooted exception to the hearsay principle. *See Bourjaily,* 483 U.S. at 182–83, 107 S.Ct. at 2782–83; *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. As we recently wrote, "to the extent that a traditional hearsay exception has sufficiently long and sturdy roots, a determination that the exception applies obviates the need for a separate assessment of the indicia of reliability which may or may not attend the evidence." *Puleio v. Vose,* 830 F.2d 1197, 1205 (1st Cir.1987), *cert. denied,* 485 U.S. 990, 108 S.Ct. 1297, 99 L.Ed.2d 506 (1988).

While a firmly rooted hearsay exception doubtless exists for former testimony given by a declarant who dies, or becomes unavailable, before the trial at issue, *see*

*Mancusi v. Stubbs*, 408 U.S. 204, 216, 92 S.Ct. 2308, 2314, 33 L.Ed.2d 293 (1972); *California v. Green*, 399 U.S. at 165–66, 90 S.Ct. at 1938–39, that exception is usually thought to hinge on defendant's counsel having had "complete and adequate opportunity to cross-examine" on the earlier occasion. *Green*, 399 U.S. at 166, 90 S.Ct. at 1939. Here, Zannino's trial had been severed and his counsel, therefore, had no chance to cross-question Smoot when the main racketeering trial occurred. We therefore assume, as appellant urges, but do not decide, that no such exception applies.

■ The presence of such a categorical exception is not, however, a *sine qua non* to admissibility, but merely a way of easing the introduction of an unavailable declarant's statements. Where, as here, no such exception is claimed, the court may still look at the totality of the circumstances to see if adequate indicia of reliability attend the evidence. *See Bourjaily*, 483 U.S. at 179, 107 S.Ct. at 2781; *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539; *Dutton*, 400 U.S. at 89, 91 S.Ct. at 219; *Dunn*, 758 F.2d at 39. To that end, we independently examine the circumstances surrounding Smoot's testimony in order to ascertain whether it passes sixth amendment muster.

■ Before embarking upon this voyage, we first address, and reject, appellant's asseveration that, absent the catharsis of cross-examination, an unavailable declarant's earlier testimony can never be reliable enough to allay constitutional concerns. While the point seems to be an open one in this circuit, our sister circuits have uniformly admitted uncrossexamined grand jury testimony into evidence at a subsequent trial where the declarant is no longer available and the requisite indicia of reliability exist. *See, e.g., United States v. Guinan*, 836 F.2d 350, 358 (7th Cir.), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988); *United States v. Marchini*, 797 F.2d 759, 764–65 (9th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987); *United States v. Walker*, 696 F.2d 277, 280–81 (4th Cir. 1982), *cert. denied*, 464 U.S. 891, 104 S.Ct.

234, 78 L.Ed.2d 226 (1983); *United States v. Barlow*, 693 F.2d 954, 963–65 (6th Cir. 1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Carlson*, 547 F.2d 1346, 1355–60 (8th Cir.1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977). Although the practice seems impeccable, we need not go quite so far today.

In this case, the reliability index is higher. Before the grand jury, testimony is not cross-examined *at all;* here, though Zannino's counsel never had an opportunity to question Smoot, the declarant was vetted at the earlier trial by defense attorneys who shared appellant's interest in denigrating Smoot's credibility. The case before us is, therefore, a much stronger one for admissibility: the functional equivalent of cross-examination by the defendant was present here, bolstering the inherent reliability of the testimony. *See Barker v. Morris*, 761 F.2d 1396, 1402–03 (9th Cir. 1985) (approving admission of testimony of deceased witness given at preliminary hearing and used at trial against defendant who was not represented at the preliminary hearing), *cert. denied*, 474 U.S. 1063, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). Thus, Smoot's sworn statements at the Angiulos' trial, as opposed to, say, grand jury testimony, offered a "particularized guarantee[ ] of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539.

■ We rule that the absence of cross-examination on appellant's behalf does not automatically require rejection of the former testimony of an unavailable declarant in a criminal case. Cross-examination, while it remains an important method of testing for the truth, is not the exclusive method by which the imprimatur of reliability can be conferred upon hearsay evidence. We do not believe it to be constitutionally required as a condition to the introduction of former testimony.

■ We now move to other indicia of reliability. Having carefully reviewed the testimony and the texture of the two trials, we agree with the district court that Smoot's former testimony contained ample trappings of dependability. The testimony

was given under oath. It was not implausible. It was solidly corroborated: to cite but a few examples, Francesco and Nicolo Angiulo were overheard discussing the $14,000 that Smoot owed to Zannino; subsequently, Zannino and Angiulo were heard debating what procedure might be appropriate were Smoot to default; and, on a later tape, a group of persons (including Zannino, Angiulo, and Isabella) rehashed the status of Smoot's debt and the anticipated arrangements for repayment. Such strong corroboration obviously enhances the testimony's reliability. *See, e.g., United States v. Workman,* 860 F.2d 140, 144–46 (4th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989); *Guinan,* 836 F.2d at 356–58; *Marchini,* 797 F.2d at 764; *Barker,* 761 F.2d at 1402. It is likewise relevant that Smoot testified about matters within his personal knowledge, *see, e.g., Marchini,* 797 F.2d at 765; that he appeared without the protection of immunity, *see, e.g., Guinan,* 836 F.2d at 358; and that no significant extrinsic evidence impeached his version of events.

There is no need to paint the lily. Smoot's former testimony, though not subject to cross-examination on appellant's behalf, bore such staunch hallmarks of reliability that its admission was completely compatible with the guarantees of the sixth amendment.

### B. *Rule 804(b)(5).*

■ Our ruling that there was no constitutional bar to use of this evidence does not end our inquiry into it. In a criminal trial, it is never enough that certain evidence is not prohibited; the proponent must be able to show, affirmatively, that it is permitted. In this case, the nonconstitutional dispute as to admissibility focuses on Fed.R.Evid. 804(b)(5). The rule provides that statements made by an unavailable declarant—and few declarants are more "unavailable" than dead men—may nonetheless be introduced if they are accompanied by "circumstantial guarantees of trustworthiness" *and* if the court determines that:

(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 804(b)(5). We review the district court's application of the rule under an abuse-of-discretion standard. *See United States v. Rodriguez,* 706 F.2d 31, 41 (2d Cir.1983); *Carlson,* 547 F.2d at 1354–55. Applying this yardstick, we find that the court acted within its discretion in deciding that Smoot's testimony satisfied the rule's requirements.

As to "circumstantial guarantees of trustworthiness," nothing need be said. We have already found that the statements were accompanied by meaningful indicia of reliability. *See supra* Part II(A). In this instance, those findings are dispositive of the "guarantees of trustworthiness" prong. Whether or not the two standards are always the same is a question we need not answer.

Turning to the rule's remaining requirements, we believe that the evidence's materiality is obvious. The record plainly indicates that Angiulo headed a loansharking business which involved Zannino, Donato Angiulo, and others, and that these individuals acted together to collect the $14,000 debt. The declarant's former testimony dealt with matters such as the circumstances surrounding the extension of credit, its terms and payment history, and the borrower's understanding that physical harm might result from nonpayment. The testimony was painfully material. It was also highly probative. Smoot had personal knowledge of the matters at issue, unique in some respects. He alone could recount his understanding of the foreseen consequences of default. With Smoot dead, his personal knowledge could best be tapped by resort to his earlier testimony. However heroic the efforts that it might undertake, the government could not be expected to procure evidence with a greater, or equivalent, probative worth. The absence of cross-examination was not fatal; noth-

ing on the face of the rule, or in its spirit, prohibits the admission of previous testimony untested by cross-examination.[6]

A dispassionate appraisal of the circumstances convinces us, as it did the lower court, that allowing the jury to hear Smoot's former testimony was consonant with both the interests of justice and the Federal Rules' general purposes. In our estimation, the panoply of factors present in this case fully satisfied the strictures of Rule 804(b)(5). *See, e.g., Marchini,* 797 F.2d at 764–65; *Barlow,* 693 F.2d at 961–62; *United States v. Boulahanis,* 677 F.2d 586, 588–89 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. Garner,* 574 F.2d 1141, 1144–46 (4th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978); *United States v. Ward,* 552 F.2d 1080, 1082–83 (5th Cir.), *cert. denied,* 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977). We discern no abuse of discretion in the district court's application of Fed.R. Evid. 804(b)(5) or in its admission of the challenged testimony.

## III. ELECTRONIC SURVEILLANCE EVIDENCE

■ Zannino attacks the district court's denial of his motion to suppress the voluminous evidence obtained through electronic surveillance. He claims that suppression is warranted because the government, in its affidavit supporting the application for judicial permission to carry out the bugging of the premises, failed to reveal previous wiretap applications.

It is true that, when the government asked the federal district court for authorization to proceed in January 1981, the moving papers did not disclose the existence of five earlier applications by Massachusetts police (circa 1978) seeking to make appellant the target of electronic eavesdropping. By the same token, the record is barren of any direct evidence that the federal investigators knew of these earlier state efforts. Appellant contends, however, that the cir-

cumstances leading to his arrest in 1978 were so well known in the Boston area that, in the present investigation, federal authorities must have known that he had been the subject of court-ordered electronic surveillance some years previously. Even if the individuals responsible for conducting the current investigation did not have actual knowledge of the prior interceptions, Zannino argues, other members of the Federal Bureau of Investigation (FBI) and Strike Force unquestionably had such knowledge. The failure to make reasonable inquiry of knowledgeable persons in those agencies, he concludes, was so reckless an omission as to invalidate the surveillance which led to the instant indictment.

We start with the applicable statute, which requires that each application for electronic surveillance include:

a full and complete statement of the facts concerning all previous applications known to the individuals authorizing and making the application, made to any judge for authorization [of electronic surveillance] involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application.

18 U.S.C. § 2518(1)(e). The statute's plain language is, we think, the best guide to its meaning. Giving the language its ordinary purport, the only potentially disqualifying knowledge is that of "the individuals authorizing and making the application." *Id.* That is how the statute reads and how it has generally been interpreted. *See, e.g., United States v. O'Neill,* 497 F.2d 1020, 1025–26 (6th Cir.1974) (complete compliance with § 2518(1)(e) achieved where application disclosed all previous applications known to individual actors, notwithstanding that other applications existed); *United States v. Harvey,* 560 F.Supp. 1040, 1073 (S.D.Fla.1982) (similar), *aff'd,* 789 F.2d 1492 (11th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986).

---

**6.** We note with approval that, before Smoot's testimony was read, the district court gave a clear, firm prophylactic instruction highlighting appellant's lack of any opportunity to cross-examine.

In this case, the district court held a pretrial suppression hearing. Collins, the Strike Force attorney who applied for the surveillance warrants, and the affiants in connection therewith (FBI agents Quinn and Rafferty), all testified that, at the time, they were unaware of the local authorities' 1978 applications. The district court credited this testimony. We review this finding only for clear error—and can discern none. That, it would seem, should end the matter: an investigator cannot be expected to disclose something he or she does not know. Section 2518(1)(e) requires government agents to be forthcoming, not omniscient.

Undeterred, appellant urges that, even if the agents were uninformed, they were chargeable with constructive knowledge. The short answer to this plaint is that the statute requires actual, not constructive, knowledge. The slightly longer answer is that, even if the government may not "recklessly remain ignorant of previous applications," *United States v. Sullivan*, 586 F.Supp. 1314, 1318 (D.Mass.1984)—an idea we leave for another day—there was no evidence of willful blindness here. At best, appellant showed the possibility of a negligent, but unintentional, violation of 18 U.S.C. § 2518(1)(e): the agents testified that they conducted a thorough inspection of FBI files to determine whether there were any prior applications for electronic surveillance directed at Zannino or other proposed targets, and came up empty. If they were careless, and erred, it profits appellant naught. Mere negligence would not warrant suppression of the evidence. *See United States v. Abramson*, 553 F.2d 1164, 1169–70 (8th Cir.), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *see also United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974) (indicating that suppression of evidence would be justified only if electronic surveillance violation contravened "those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device"); *cf. United States v. Mora*, 821 F.2d 860, 870 (1st Cir.1987) (evidence obtained through wiretaps was admissible at defendants' trial even though tapes were not judicially sealed in strict accordance with 18 U.S.C. § 2518(8)(a)).

Because the record amply supports the district court's finding that the responsible government officials were unaware, after a good faith inquiry, of the earlier state applications for electronic surveillance, the disclosure requirements of section 2518(1)(e) were not flouted. The motion to suppress was properly rebuffed.[7]

## IV. SUFFICIENCY OF THE EVIDENCE

While tacitly admitting the sufficiency of the evidence on count one of the redacted indictment (which involved his role in the North Margin St. poker games), appellant raises a sufficiency challenge to counts two and three. Our task is to determine whether any rational jury, taking the evidence in its totality and in the light most flattering to the government, could have found appellant guilty beyond a reasonable doubt. *See Cintolo*, 818 F.2d at 983. The evidence, of course, must be sufficient as to each essential element of the crime charged.

### A. *Barbooth Gambling.*

■ As to count two, appellant takes a rifle-shot approach: he effectively concedes the legal adequacy of the government's proof in most respects, but asserts that the prosecution did not show that at least five persons were involved in conducting the unlawful barbooth gambling. Appellant is shooting blanks.

We start by observing that the five person minimum is expressly made an element of the offense with which Zannino was

---

7. Zannino also argues that the evidence obtained at North Margin St. should be suppressed because the order authorizing electronic surveillance was not supported by probable cause. He did not raise this claim below and has, therefore, waived it for purposes of this appeal. *See United States v. Figueroa*, 818 F.2d 1020, 1025 (1st Cir.1987); *United States v. Argentine*, 814 F.2d 783, 791 (1st Cir.1987). In any event, the argument has no real basis.

charged.[8] In the lexicon of section 1955, the term "conduct" embraces all who participate in the operation of the specified gambling business, that is, each and every person who performs any act, function, or duty necessary or helpful in the business' ordinary operation. As we read it, the statute of conviction applies even to individuals who have no role in managing or controlling the business and who do not share in its profits. *Cf.* Joshua 9:21 (discussing "hewers of wood and drawers of water"). In sum, section 1955 proscribes any type or degree of participation in an illegal gambling business, except participation as a mere bettor. *Sanabria v. United States,* 437 U.S. 54, 70–71 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43 (1978); *United States v. DiMuro,* 540 F.2d 503, 508 (1st Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Once this coign of vantage is established, the dampness of appellant's powder becomes readily apparent.

■ Based on tape recorded conversations and other evidence, the government's expert witness, Daly, testified that at least five persons were involved "in the managing, financing or running of [the] barbooth game from at least Christmas of 1980 through March of 1981." He identified the five as Angiulo, Zannino, Francesco Angiulo, Vulgaropoulus, and Roberto, and described their roles in the enterprise. Appellant wastes little time on the first four— and with good reason; the evidence as to them was plenteous. He trains his guns instead on Roberto's inclusion, assailing the admission of Daly's testimony and denigrating the government's ancillary evidence. The volley misfires.

The court's allowance of Daly's opinion evidence cannot be faulted. *See United States v. Ladd,* 885 F.2d 954, 959 (1st Cir. 1989) (discussing trial judge's discretion in determining both admissibility of expert testimony and particular expert's qualifications); *United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir.1987) (similar); *see also United States v. Lamattina,* 889 F.2d 1191, 1194 (1st Cir.1989). The jury, we think, was entitled to consider Daly's testimony and assess its credibility and probative value in light of all the evidence. Furthermore, Daly's testimony seems sufficiently record-rooted to sustain a finding that Roberto participated in operating the barbooth game.

Our conclusion concerning the adequacy of the proof anent Roberto's complicity, and thus, Zannino's guilt, is bulwarked by the other evidence corroborating Roberto's involvement. We offer a representative sampling:

1. Roberto was at North Margin St. no less than five times during the surveillance period.

2. Roberto, testifying as a defense witness, admitted being at the Demosthenes Club on various occasions in 1980–81 while barbooth was being played. (Although he said he was merely a player, the jury was not bound to believe that aspect of his story.)

3. In a February 1981 conversation, Zannino told Angiulo that he was sending for Roberto and Roberto's "partner," Vulgaropoulus, to resolve a discrepancy regarding the profits from the barbooth gambling business.

4. In a March 1981 conversation, Zannino and Angiulo gloated over the money that Roberto was bringing them from the game.

5. In November 1981, Vulgaropoulus and Roberto were arrested when state authorities raided the barbooth game. Gambling paraphernalia was seized on that occasion.

Viewing this evidence in conjunction with Daly's testimony, a rational jury could easily have found, beyond any reasonable doubt, that Roberto performed a necessary, or at least facilitative, role in the ordinary

8. The statute provides in relevant part:
   Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be [guilty of a crime].... As used in this section—"illegal gambling business" means a gambling business which—involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business.... 18 U.S.C. § 1955.

operation of the barbooth gambling business.

### B. *Loansharking.*

Appellant also asserts that there was insufficient evidence to sustain his conviction under 18 U.S.C. § 892(a). He notes that the statute requires that loans, to be extortionate, be made in a climate of fear—fear that "violence or other criminal means" will follow hard upon nonpayment[9]—and he claims that there is no proof that he and the borrower, Smoot, reached a mutual understanding that physical harm could ensue if timely payments were not forthcoming on the $14,000 debt. While appellant is correct that the understanding of both creditor and debtor is crucial to proving a substantive violation of 18 U.S.C. § 892(a), *see United States v. DeVincent*, 546 F.2d 452, 454–56 (1st Cir. 1976), *cert. denied*, 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977), his argument nevertheless fails.

Congress recognized that it might be difficult to prove the understanding of the creditor directly. Thus, the lawmakers went on to provide that "if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate...." 18 U.S.C. § 892(b). The statute enumerated four factors: (1) that repayment is unenforceable through civil judicial processes; (2) that the loan requires interest greater than 45% per year; (3) that the loan exceeds $100; and (4) that the debtor reasonably believes that the lender either has used extortion to collect other debts or has a reputation for doing so. *See* 18 U.S.C. §§ 892(b), (c); *see generally United States v. Dennis*, 625 F.2d 782, 800–01 (8th Cir.1980); *United States v. Annoreno*, 460

F.2d 1303, 1308–09 (7th Cir.), *cert. denied*, 409 U.S. 852, 93 S.Ct. 64, 34 L.Ed.2d 95 (1972). In effect, the statute creates a rebuttable presumption, triggered by proof of the statutory factors. *See United States v. Martorano*, 557 F.2d 1, 8 n. 3 (1st Cir.1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978). Here, the requisite understanding of both creditor and debtor was satisfactorily established by objective evidence verifying the existence of the first three factors; by Smoot's testimony as to his beliefs; and by a demonstration, founded upon the totality of the evidence, that Smoot's fears were reasonable under the circumstances.

We need hardly pause over the introductory triad. Smoot's $14,000 debt was incurred in the course of illegal gambling activity; it was never reduced to writing; it was obviously unenforceable through the usual judicial channels; and it carried a usurious interest rate of at least 52% per annum.[10] The evidence as to Smoot's expressed fears seems self-explanatory: Smoot testified that he believed Zannino to be Cincotti's boss; he knew Donato Angiulo's reputation for violence; and he feared the use of force if he did not make his scheduled payments. The plausibility of Smoot's trepidation cannot seriously be doubted. Evidence of a defendant's nexus to organized crime can be taken into account in evaluating reasonableness of a debtor's fears, *see DeVincent*, 546 F.2d at 456–57, and Zannino's own statements—he boasted incessantly about his reputation as a loanshark and his use of violence and threats to collect indebtednesses—established that he was a Capo Regime in the Patriarca Family. Smoot testified that, during the pendency of the debt, he was acutely aware of the reputation for vio-

---

**9.** The statute of conviction criminalizes the making of "any extortionate extension of credit." 18 U.S.C. § 892(a). Congress has defined an "extortionate extension of credit" as comprising:

> Any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or

> other criminal means to cause harm to the person, reputation, or property of any person. 18 U.S.C. § 891(6).

**10.** The evidence showed that, in respect to the $2000 "piece" of the debt which Zannino assigned to Isabella, Smoot was charged interest equivalent to 104% per annum. Both rates were unlawful: the maximum legal rate in effect in Massachusetts at the time was 20%.

lence possessed by both Zannino and Zannino's "collector," Donato Angiulo. Smoot knew of their involvement in organized crime and knew that he could be threatened with physical harm if he failed to make timeous repayments.

Given the statutory framework, the jury was unquestionably entitled to infer that, at the relevant times, Zannino and Smoot had a mutual understanding that physical harm could befall the latter if he delayed or defaulted in squaring his account with the former. The essential elements of the crime were proven.

## V.   ZANNINO'S HEALTH

The cornerstone upon which Zannino's appeal rests is a claim that the district court abused its discretion by denying a motion to postpone his trial indefinitely. As a spinoff of this asseveration, appellant says that he was also prejudiced in that, as the trial proceeded, his physical and mental condition deteriorated to the point where he could not testify and was thus deprived of his constitutional right to aid his defense and present witnesses on his own behalf. We have combed the record and discovered more cry than wool.

### A.   *Setting the Stage.*

Zannino was hospitalized in 1977, having sustained a myocardial infarction, preceded by angina pectoris and congestive heart failure. During the next two years, he was hospitalized twice more; consequently, he was found unable to stand trial in a gambling prosecution unrelated to the instant case. He was readmitted to the hospital several times from early 1981 to mid–1983 due to chest pains and other symptoms. In September 1983, on the very day that the instant indictment was returned, appellant was hospitalized, complaining of chest pain. He was discharged in January 1984. The discharge diagnosis read: "Atherosclerotic heart disease, unstable angina pectoris, history of myocardial infarction, coronary insufficiency and congestive heart failure." Other brief hospitalizations followed. He continued under medical supervision.

Zannino moved to continue the racketeering trial, citing his ill health. Following an evidentiary hearing, the district court found in June 1985 that the likelihood of myocardial infarction, high grade ventricular arrhythmia, or cardiac arrest were, in fact, remote. The court also found Zannino's angina and congestive heart failure to be treatable and controllable with proper medication and diet. The court noted that Zannino was to some extent responsible for exacerbating his health problems by failing either to follow prescribed diet or to take medication on schedule. The court concluded that, on balance, Zannino was able to stand trial.

The case against Zannino and his codefendants subsequently went forward. A jury was selected. On the day that opening statements began (July 10, 1985), appellant was again hospitalized. Six days later, he suffered a second myocardial infarction. With the government's consent, his case was severed from the ongoing trial of his codefendants. That trial lasted until February 28, 1986.

Meanwhile, the district court monitored Zannino's medical condition in connection with both his ability to stand trial and his eligibility for pretrial release. Much of what transpired has been described before, *see United States v. Zannino,* 798 F.2d 544, 545 (1st Cir.1986) (per curiam), so we can be succinct. It suffices to observe that the medical opinions conflicted. Evidentiary hearings were held. Eventually, a panel of three renowned cardiologists reviewed Zannino's medical records at the district court's request and submitted a report. The judge then forwarded certain supplementary materials to the panel and posed some follow-up questions. In August 1986, the panel issued another report. Collectively, the reports (both of which were unanimous) concluded that Zannino suffered from chronic coronary heart disease, not likely to improve, and had experienced myocardial infarctions and angina pectoris. Zannino was likely to undergo periodic bouts of chest discomfort regardless of whether he was on trial. The physicians noted, however, that the "vast majority of episodes of 'chest discomfort' ... are rapid-

ly relieved by oral medication [and are] not usually life threatening" and thus, "could be rapidly diagnosed as not requiring hospitalization." A lengthy trial would be likely to increase the frequency of such episodes; a shorter, less intense trial would be safer. The panel recommended certain precautions if such a trial were to occur: abbreviated trial days; periodic mid-trial medical examinations; continuous monitoring by electrocardiogram while in the courtroom; instant availability of emergency medications and supplies (including oxygen and a defibrillator); and the presence of medical personnel at the trial. The panel also suggested that Zannino be tried alone.

After reviewing the reports and balancing competing considerations, the district court concluded that, given the gravity of the charges and the permanent nature of Zannino's illness, the government's interest in trying Zannino outweighed the personal risks inherent in a specially tailored trial. Those risks, in the court's view, could be substantially reduced by a shorter trial on fewer charges, conducted under prophylactic conditions. To that end, the judge severed the most complex charges against Zannino (*e.g.*, racketeering by means of a continuing criminal enterprise), adopted the physicians' recommendations as to procedure and special arrangements *in toto*, denied the motion for an indefinite postponement, and ordered Zannino to stand trial on the three specific offense counts which we have discussed. The trial went forward on January 27, 1987 and lasted about a month.[11]

### B. *Failure to Postpone.*

A district court's decision to deny a continuance can be disturbed on appeal only for abuse of discretion. *Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983); *Real v. Hogan,* 828 F.2d 58, 63 (1st Cir. 1987); *see also* Note, *A Capital Defendant's Right to a Continuance Between the Two Phases of a Death Penalty Trial,*

64 N.Y.U.L.Rev. 579, 593 (1989) (district judge's discretion to deny a continuance is limited only where refusal to grant more time infringes upon a constitutional right). Moreover, in a case where a continuance request is predicated on medical dangerousness, the judge must be given a relatively wide berth. He has firsthand knowledge of the defendant and his situation, gained over time; he knows the courtroom conditions and the circumstances of trial intimately, and possesses great familiarity with the scope and complexity of the litigable issues; he has the ability to question health care providers and solicit additional opinions; he can best sift overstatement from understatement, eyeing the defendant's and the doctors' credibility, and tempering the prosecutors' zeal; and he will usually have developed a "feel" for factors like intensity and stressfulness. We believe it is perilous for an appellate tribunal, traversing the frozen tundra of an inert record, to secondguess the trial judge's informed synthesis of the relevant integers which enter into so ramified an equation. *See United States v. Bernstein,* 417 F.2d 641, 643 (2d Cir.1969) ("The determination of competence to stand trial is basically a question of fact; [and] the trial judge is in a better position to resolve it than the appellate courts.").

While we give deference to the district court's assessment, we do not owe it blind allegiance. We look to see whether the court below had evidence before it which was, qualitatively and quantitatively, sufficient to support the decision which it reached. *See United States v. Alexander,* 869 F.2d 808, 811 (5th Cir.1989); *United States v. Brown,* 821 F.2d 986, 988 (4th Cir.1987); *Bernstein,* 417 F.2d at 643; *see also Independent Oil and Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988) (stating test for abuse of discretion). The mere possibility of an adverse effect on a party's wellbeing is not enough to warrant a postponement. We agree with the Fourth Circuit that "the medical

---

11. The court recessed for a week in the middle of trial (February 17–24) so that appellant could undergo medical tests in a hospital setting. The

testimony concluded shortly thereafter. The jury returned its verdict on March 6.

repercussions must be serious and out of the ordinary; the impending trial must pose a substantial danger to a defendant's life or health." *Brown*, 821 F.2d at 988. Throughout, we bear in mind that our function is one of review, not of independent evaluation: if the evidence can, on balance, fairly sustain either of two plausible conclusions, and the lower court chose one, we have no right to interfere.

■ Because circumstances vary so widely, we can present no all-inclusive checklist of the factors which bear on such a determination. When a colorable claim of medical dangerousness is lodged and contested, the court must carefully investigate the situation, assemble the pertinent data, and then consider not only the medical evidence but also the defendant's activities (in the courtroom and outside of it), the steps defendant is taking (or neglecting to take) to improve his health, and the measures which can feasibly be implemented to reduce medical risks. Once a dangerousness quotient is established, the judge must weigh the foreseeable risks against the demonstrable public interest, taking into account factors such as the severity of the charges and the extent of the government's interest in trying the defendant. If the perceived risks overbalance the perceived benefits, a continuance must be granted.

■ In the case at bar, we note approvingly that the court gave appellant ample time to allow his condition to ameliorate or stabilize. The court also took elaborate pains to gather the best information and opinions obtainable: the parties were allowed full rein to present their evidence; the judge then solicited assessments from three eminent (and detached) cardiologists. The court considered the medical opinions, the defendant's activities, the foreseeable risks (including the fact that a trial would doubtless subject Zannino to considerable emotional strain, thus aggravating his angina attacks and perhaps exacerbating other health problems)[12], the nature of the charges, their separability, the public interest in a trial, the defendant's right to assist in his own defense, the prospect that more time might alter the scales' angle, and a series of intangibles. All in all, the court appears to have weighed the correct factors. The question then becomes whether, in constructing the balance, the court committed a meaningful error in judgment. *See Independent Oil and Chemical Workers*, 864 F.2d at 929 (so long as the proper factors have been considered, judicial discretion is abused only if "the court makes a serious mistake in weighing them").

We review the district judge's findings and the balance he struck. The judge found that Zannino would have chest pains whether or not he was in court; that, in all likelihood, his angina attacks could be palliated by oral medication; and that such attacks, although potentially serious if not relieved, were not life threatening. The judge noted that much of the maintenance of defendant's health was in his own hands; he was responsible for monitoring his diet and medication in order to avoid untoward consequences. The court fully considered the ravages of trial and concluded that, while a trial "would increase the risk of [Zannino's] sustaining another life threatening coronary incident in some degree that is neither trivial nor precisely measurable," the danger was not undue. And the court found that the public interest in bringing Zannino to trial was great.

In addition, the district court took substantial steps to reduce the medical risks incident to trial. First, it ordered Zannino tried alone and severed most of the charges against him, leaving only three. These three were handpicked to create both a

---

12. Zannino's underlying problem was diagnosed authoritatively as coronary atherosclerosis (the narrowing of the coronary arteries). Absent surgical intervention in the form of bypass surgery or angioplasty (measures Zannino has thus far rejected), this condition is permanent and progressive. Zannino's coronary atherosclerosis was the likely principal cause of his two myocardial infarctions. The atherosclerosis has also afflicted Zannino for years with angina pectoris (recurrent attacks of chest pain). Angina is usually relieved by the ingestion of nitroglycerin tablets, a form of treatment that the court found Zannino had employed successfully.

shorter trial and one likely to curtail wear and tear on the defendant (emotional as well as physical).[13] Second, the normal trial day and week were abbreviated. Third, special medical safeguards were made available, including provisions for periodic medical examinations during trial, continuous coronary monitoring, and on-the-spot accessibility to medical equipment. Two emergency medical technicians were in attendance during court sessions. An ambulance was parked in the courthouse garage. These precautions not only minimized the chance that a tragedy would occur, but must have served to ease the defendant's health-related concerns.

We acknowledge that a stand-trial determination in the case of an ailing defendant is among the most problematic that a federal district judge is called upon to make. "Whether a defendant's physical condition is so poor as to require a continuance or severance is not only a difficult determination ..., but it is one which carries with it the tremendous responsibility of weighing the invariably unpredictable factor of defendant's health against the government's, indeed the public's, legitimate interest in a fair and speedy disposition." *Bernstein v. Travia*, 495 F.2d 1180, 1182 (2d Cir.1974). A criminal trial is by its nature ordealistic—but that fact alone cannot abrogate the pronounced public interest in bringing promptly to book those accused of high crimes and felonies. *See id.* In this case, the crimes charged were of the gravest order and the defendant's involvement was alleged to be at the uppermost level. His medical condition was unlikely to improve, rendering a continuance functionally equivalent to a permanent ban against trial. In ordering Zannino into the dock, the court below carefully evaluated these factors and the other pertinent considerations; tailored the charges to fit the defendant's physical and emotional resources; and utilized critical firsthand impressions that we lack. We cannot say that the district judge—whose thoroughness resonates from every page of the record pertaining to this issue—misused his broad discretion.

Because the dangerousness quotient, though palpable, was not excessive, the denial of appellant's motion for a continuance was permissible. *See, e.g., Alexander*, 869 F.2d at 811 (trial judge's reasoned determination that defendant was physically able to testify in his own behalf and stand trial must prevail absent abuse of discretion); *United States v. Pastor*, 557 F.2d 930, 939 (2d Cir.1977) (where defendant suffered from angina pectoris but trial judge had implemented sufficient safeguards, deference was justified); *Travia*, 495 F.2d at 1182 (similar); *see also Brown*, 821 F.2d at 989. The perceptible risks inherent in a specially-structured trial did not overbalance the perceptible benefit to the public.

### C. *Deleterious Effects of Trial.*

Appellant also asserts that his health deteriorated under the strain of trial, creating a special sort of prejudice. The thesis runs along the following lines: in his opening statement, defense counsel, not knowing how the vagaries of trial would affect a sick man, told the jury that Zannino's testimony was crucial to an understanding of the case; due to failing health, however, Zannino proved unable to testify when it came time for the defense case; thus, the jury, expecting to hear Zannino's testimony, most probably held his failure to testify against him. In this way, appellant says that he was deprived of due process.

We find this logomachical frock gaping at several seams. Most critically, there is not a shred of evidence that Zannino's condition worsened to the point where he became medically unable to testify. There was excellent reason, tactically, for Zannino to avoid the witness stand. That he decided not to testify, and that his counsel intimated to the jury that his health precluded him from testifying, is a far cry from proving either the claimed deterioration or the etiology of the decision to stay

---

**13.** One rough measure of the success of the district court's pruning is that Zannino's separate trial, notwithstanding truncated days, lasted approximately one-eighth as long as the trial of Granito and the Angiulo brothers.

off the witness stand. No further medical evidence was presented during the course of the trial and no change in circumstances was shown. On these facts, the assignment of error is infirm.

There is also a second reason why the initiative collapses. We have scoured the record without unearthing any indication that the defense made a motion for mistrial, or any other appropriate relief, at the point when Zannino "believed" that he could no longer testify. In our view, appellant's present claim is toppled by his neglect to ask for a further continuance, or a mistrial, to meet the supposed exigency of which he now complains. *Cf., e.g., United States v. Diaz-Villafane,* 874 F.2d 43, 47 (1st Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989); *United States v. Ingraldi,* 793 F.2d 408, 413 (1st Cir.1986). If there was a legitimate problem, it was incumbent upon Zannino to bring it to the trial court's attention in a timely fashion and ask for concinnous relief. The failure to do so constitutes a waiver.

## VI. POTPOURRI

We touch briefly upon certain other points raised by appellant, none of which requires extended comment.

### A. *Severance.*

■ After the district court narrowed the scope of trial to the three counts described *supra,* appellant moved for a further severance, alleging misjoinder. Fed. R.Crim.P. 8(a), 14. The district court denied the motion. Zannino polemizes against the ruling, but to no avail.

Rule 8(a) authorizes joinder of offenses if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." All of the three offenses involved here were alleged by the Grand Jury to be predicate acts committed in furtherance of the racketeering enterprise and conspiracy. This court, and other courts of appeals, have consentiently held that offenses committed pursuant to the same (charged) racketeering enterprise and conspiracy may be joined in a single indictment since, in the terminology of Rule 8(a), they are based on "two or more acts or transactions connected together or constituting parts of a common scheme or plan." *See, e.g., United States v. Doherty,* 867 F.2d 47, 63 (1st Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989); *United States v. Kragness,* 830 F.2d 842, 861–62 (8th Cir.1987); *United States v. Williams,* 809 F.2d 1072, 1085–86 (5th Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987); *United States v. Caporale,* 806 F.2d 1487, 1510 (11th Cir.1986), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). The happenstance that appellant was not tried on the RICO count did not alter the calculus; indeed, the same joinder principle applies even if the RICO offense was not charged against the particular defendant. *See United States v. Manzella,* 782 F.2d 533, 539–40 (5th Cir.), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986); *United States v. Weisman,* 624 F.2d 1118, 1129 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980).

Not only were the three counts properly joined, but appellant has not made the requisite showing of prejudice to warrant separating them. Given the trial court's precise instructions, the relative simplicity of the evidence, and the fact that Zannino was tried alone, it borders on the frivolous to claim that the failure to isolate the three residual charges from each other deprived him "of a fair trial, resulting in a miscarriage of justice." *United States v. Arruda,* 715 F.2d 671, 679 (1st Cir.1983); *see also United States v. Walker,* 706 F.2d 28, 30 (1st Cir.1983); Fed.R.Crim.P. 14. There was no misuse of the district court's considerable discretion.

### B. *Evidence Admitted.*

Appellant contests the introduction of certain tape-recorded conversations. We need not flog a moribund mare; having reviewed his contentions and the indicated conversations, we find that the challenged

recordings were sufficiently relevant so as to be admissible in the trier's discretion. That being so, the district court was required to strike a balance between probative worth and likely prejudice. *See* Fed.R. Evid. 403. Our perscrutation of the nisi prius roll reveals no reason to disrupt the lower court's calibration of the scales. "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Machinery Corp.*, 865 F.2d 1331, 1340 (1st Cir.1988). This is not the rare case.

■ Zannino also complains about the jury having heard evidence of an earlier extortionate scheme which he allegedly operated in concert with Thomas Peachie and Carmen Tortora. The complaint is jejune. The jury was entitled to find, from appellant's own mouth, that he was in league with Peachie and Tortora. The earlier scheme was reasonably proximate in time to the charged extortion.[14] And we, like the district court, believe that the material was competent, under Fed.R.Evid. 404(b), to show Zannino's criminal intent and extortionate understanding vis-a-vis the Smoot loan. *See, e.g., United States v. Rodriguez–Estrada*, 877 F.2d 153, 156 (1st Cir.1989); *United States v. Pepe*, 747 F.2d 632, 670–71 (11th Cir.1984); *United States v. Zeuli*, 725 F.2d 813, 816–17 (1st Cir. 1984); *see generally Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

### C. *Incorporation by Reference.*

■ As mentioned earlier, *see supra* note 1, defendant's appeal was consolidated for oral argument with appeals prosecuted by the Angiulos and Granito. In a cursory reference in his appellate brief, Zannino seeks to "adopt[ ] all of the arguments made on behalf of co-defendants Gennaro, Donato and Michele Anguilo [sic], and co-

defendant Samuel Granito, as each argument applies to this appellant." We summarily reject this ploy. The codefendants were tried apart from Zannino, on a somewhat different array of charges. They have raised a series of issues which relate to their separate trial in ways not readily transferrable to Zannino's circumstances.

Perhaps more important, we see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. *See, e.g., Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 353 (1st Cir. 1989); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir.1988). It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As we recently said in a closely analogous context: "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988) (quoting *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir.1988)).

### VII. CONCLUSION

We need go no further. Our scrutiny of the case persuades us that all of Zannino's contentions must be rejected. No significant legal error appearing, appellant's convictions and his sentence must be

*Affirmed.*

---

**14.** There was evidence that the earlier scheme continued up to one year, more or less, before

Smoot's indebtedness was incurred.