BARRON, Circuit Judge, concurring.
*63 I join in full our opinion affirming the District Court's dismissal of Maine Pooled Disability Trust's ("MPDT") claim that "no statute imposes a transfer of assets penalty for transfers to an exempt pooled special needs trust such as the MPDT." I think it important to emphasize, though, one point that our opinion notes: MPDT failed to make any developed argument to us that the Maine Department of Health and Human Services ("MDHHS") violated its statutory right to operate a pooled special needs trust pursuant to 42 U.S.C. § 1396p(d)(4)(C) by not recognizing the settlement of such a trust as a transfer of assets for "fair market value." 42 U.S.C. § 1396p(c)(1)(A).
In consequence of that failure, we have no occasion to address that distinct legal contention. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). But, in future cases, settlors of pooled special needs trusts, and perhaps the trusts themselves, may well seek to argue in support of their § 1983 suits against states seeking to impose the transfer penalty that no such penalty may be imposed, because the settlor receives "fair market value" for the funds used to create the trust from the expenditures that the trust makes for the settlor's benefit. And, in the event that argument is pressed in such future cases,[4] they may well bring to the fore an issue that we bypass here, but that may bear on how these technical statutory provisions should be construed: whether the Centers for Medicare & Medicaid Services ("CMS") is of the view that the settlement of a pooled special needs trust may constitute a transfer of assets for "fair market value" within the meaning of 42 U.S.C. § 1396p(c)(1)(A) ?
I thus write separately to explain why that issue may matter, in hopes of clearing away some possible confusion down the line. For, whether CMS considers the settlor of a pooled special needs trust to have received "fair market value" from the expenditures that the trust makes on the settlor's behalf may very well affect the persuasiveness of a contention by a future settlor of such a trust -- or by the trust itself -- that no transfer penalty should be imposed. After all, this body of law is quite technical, and the case for according deference to a persuasive interpretation of it by CMS would seem to me to be quite strong. See *64 United States v. Mead Corp., 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("There is room ... to raise a Skidmore claim ... where the regulatory scheme is highly detailed, and [the agency] can bring the benefit of specialized experience to bear on the subtle questions in th[e] case." (citing Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) )).
I.
CMS's state Medicaid eligibility manual, Transmittal 64, provides that no transfer penalty should be imposed on the settlement of an exempt trust if "resources placed in the trust are used to benefit the individual, and the trust purchases items and services for the individual at fair market value." State Medicaid Manual, Health Care Financing Administration Pub. 45-3, Transmittal 64, § 3259.7(B)(2) (Nov. 1994) [hereinafter "Transmittal 64"]. MPDT -- like MDHHS -- appears to be of the view that CMS created this "fair market value" workaround only for so-called Miller trusts, see 42 U.S.C. § 1396p(d)(4)(B), and not for pooled special needs trusts. I say that because MPDT advances an argument in service of its contention that the transfer rule does not apply to exempt trusts that necessarily proceeds on that assumption.
But, contrary to MPDT's apparent view, the text of Transmittal 64 seems most naturally read to treat the rules concerning the "fair market value" workaround as applying to all exempt trusts, pooled special needs trusts among them. The subsection of Transmittal 64 that sets forth the eligibility rules for pooled special needs trusts states, in no uncertain terms, that "[r]esources placed in an exempt trust for a disabled individual are [not] subject to imposition of a [transfer] penalty ... [if] the resources placed in the trust are used to benefit the individual, and the trust purchases items and services for the individual at fair market value." Transmittal 64 § 3259.7(B)(2) (emphasis added).
That subsection does direct us to "[s]ee subsection C" -- which is, in turn, titled "Miller-Type or Qualifying Income Trusts (QIT)" -- "for the rules concerning application of the transfer of assets provisions to assets placed in an exempt trust." Id. (emphasis added). But, the subsection goes on to state that "[t]hese rules apply to ... resources placed in the exempt trusts discussed in this section," which include pooled special needs trusts. Id. (emphasis added).
Some states -- including Maine -- appear to share MPDT's view that CMS does not treat the deposit of funds into a pooled special needs trust as a transfer for fair market value, even if the trust makes purchases on the settlor's behalf. The states appear to base that understanding on a subsequent bulletin that CMS issued in 2008 on the treatment of pooled special needs trusts (the "2008 Bulletin"), which does not mention this "fair market value" workaround for that type of trust. See Ctrs. for Medicare & Medicaid Servs., State Agency Reg'l Bull. No. 2008-05, Medicaid Eligibility -- Application of Transfer of Assets Penalty for Pooled Trust (May 12, 2008).
But, while the 2008 Bulletin does instruct state agencies that, pursuant to 42 U.S.C. § 1396p(c)(2)(B)(iv), "only [pooled] trusts established for a disabled individual age 64 or younger are exempt from application of the transfer of assets penalty provisions," 2008 Bulletin at 1 (emphasis added), that statement is not necessarily at odds with the view that I glean from Transmittal 64. Even if the Transfer Provision does apply to pooled special needs trusts, a transfer penalty may only be imposed under that provision where the settlor "disposes of assets for less than fair market value." 42 U.S.C. § 1396p(c)(1)(A)
*65 (emphasis added).[5] Thus, the fact that the 2008 Bulletin states that "funds placed in a pooled trust established for an individual age 65 or older may be subject to penalty as a transfer of assets for less than fair market value" actually suggests -- contrary to the views of some states -- that CMS may still recognize, as it appeared to in Transmittal 64, that such a disposal of assets may escape a transfer penalty if it is for "fair market value." 2008 Bulletin at 1 (emphasis added).
Notably, the United States's amicus brief on behalf of CMS is silent on this very point. That fact only serves to underscore for me the possibility that CMS is still of the view that it seemingly espoused in Transmittal 64: that the settlor of a pooled special needs trust can be deemed to receive fair market value for settling the trust from the purchases that the trust can make on her behalf. Consistent with that suspicion, the United States's amicus brief even emphasizes that "for purposes of this appeal, it is undisputed that [the settlor] did not receive fair market value in disposing of [her] assets [to MPDT]."
II.
Insofar as CMS does hold such a view, there remains the question of how the "fair market value" workaround would work. Transmittal 64 provides that "an individual is considered to have received fair market value for funds placed in a[n] [exempt] trust" from certain payments "out of the trust." Transmittal 64 § 3259.7(C)(3). The payments include those made "out of the trust for medical care provided to the individual," which "purchased care at fair market value" and "any other payments made from the trust which are for the benefit of the individual and which reflect fair payments for any items or services which were purchased." Id. The items or services purchased are, in turn, described as including trust fees, "food or clothing for the individual, or mortgage payments for the individual's home." Id.
Given that the workaround is based on purchases that the trust makes after funds have been placed in the trust, it runs into a potential statutory problem. The transfer rule imposes an eligibility penalty only if an applicant "disposes of assets for less than fair market value" within the look-back period. 42 U.S.C. § 1396p(c)(1)(A). The statute does not define "dispose[ ]" or "fair market value." But, as our opinion explains, and as Transmittal 64 itself reflects, the ordinary meaning of "dispose[ ]" encompasses a deposit of funds into a trust -- even an exempt trust -- because "[a]n individual placing an asset in a trust generally gives up ownership of the asset to the trust." Transmittal 64 § 3259.6(G).
Read in light of the entire statutory phrase, then, the relevant inquiry for determining whether a disposal of assets is "for less than fair market value" would seem to be whether "the individual ... receive[s] fair compensation in return" for the assets at the time of their disposal. Id. And, consistent with that understanding, Transmittal 64 itself defines "fair market value" as "an estimate of the value of an asset, if sold at the prevailing price at the time it was actually transferred." Id. § 3258.1(A)(1) (emphasis added).[6] Hence, *66 the potential problem with the workaround: At the actual time of the transfer into the trust, the settlor usually receives nothing tangible -- at least, nothing that could be said to constitute "fair market value" -- immediately in return, even if the trust is set up in a manner that obligates the trust to make future purchases of services or goods (at fair market value) for the settlor's benefit.
Transmittal 64 appears to recognize the potential statutory problem that arises from the mismatch between the timing of the settlor's deposit and the trust's expenditures, and it thus appears to propose a solution to the seeming problem. It provides that "[a]n individual cannot be considered to have received fair market value for funds placed in a trust until payments for some item or service are actually made." Transmittal 64 § 3259.7(C)(3) (emphasis added). "Thus," according to Transmittal 64, "funds cannot be allowed to accumulate indefinitely in a[n] [exempt] trust and still avoid transfer of assets penalties." Id.
Transmittal 64 in this way seems to contemplate that a retroactive adjustment of the transfer penalty would need to be made after "payments [out of the trust] for some item or service are actually made." Id. Transmittal 64 says little about how such a retroactive adjustment could be made. But, Transmittal 64 does note that the Transfer Provision separately provides that no transfer penalty should be imposed when "all assets transferred for less than fair market value have been returned to the individual." See 42 U.S.C. § 1396p(c)(2)(C)(iii) ; Transmittal 64 § 3258.10(C)(3). And, with respect to that separate statutory exception, Transmittal 64 explains that "[w]hen a penalty has been assessed and payment of services denied, a return of assets requires a retroactive adjustment, including erasure of the penalty, back to the beginning of the penalty period." Transmittal 64 § 3258.10(C)(3). Transmittal 64 further provides, in explaining how that retroactive adjustment may be made, that "[w]hen only part of an asset or its equivalent value is returned, a penalty period can be modified but not eliminated. For example, if only half the value of the asset is returned, the penalty period can be reduced by one-half." Id.
III.
There is a case to be made, then, that CMS is of the view that the Medicaid statute permits this retroactive "fair market value" workaround for pooled special needs trusts that I have just described. And thus, a settlor of a pooled special needs trust, or such a trust itself, may be well positioned to assert in a future case both that no transfer penalty may be imposed on deposits into such a trust even if the transfer rule does -- as we now hold -- apply and that CMS itself holds that same view.
Having CMS as an ally in such a suit obviously could be quite helpful. After all, the statute itself does not define "dispose[ ]" or "fair market value." CMS's expertise in interpreting those key statutory terms in such a highly technical regulatory regime thus would seem to "warrant[ ] respectful consideration."
*67 Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 497, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002) (noting CMS's "significant expertise ... in the context of a complex and highly technical regulatory program" (internal quotation marks and citations omitted)); see also Mead, 533 U.S. at 235, 121 S.Ct. 2164.
We are not confronted here, however, with any such contention by MPDT. It argues that no transfer penalty should have been imposed on the settlor only because it asserts that the transfer rule itself does not apply. I thus fully agree that the decision below must be affirmed, as we face only a case in which CMS contends that the transfer rule does apply and in which the pooled special needs trust at issue has made no argument that it has been established in such a way that its settlor should be deemed to comply with that rule's "fair market value" condition.

For reasons not relevant here, the District Court determined below that it had no jurisdiction to hear the settlor's § 1983 claim. See Richardson ex rel. Carlin v. Hamilton, No. 2:17-CV-00134-JAW, 2018 WL 1077275, at *5 (D. Me. Feb. 27, 2018). The District Court also concluded that the trust itself -- MPDT -- was not positioned to argue, under § 1983, that it had an enforceable right that had been violated by MDHHS, insofar as MPDT sought to premise that enforceable right on 42 U.S.C. § 1396p(c) (the "Transfer Provision"). See id. at *12-13. MPDT does not challenge that ruling and thus makes no contention that, even if the transfer rule does apply, no transfer penalty may be imposed because its "fair market value" condition has been met. See 42 U.S.C. § 1396p(c)(1)(A). There is precedent to suggest, however, that settlors of such trusts -- and perhaps the trusts themselves -- may sue states under § 1983 for subjecting deposits into such trusts to the transfer penalty in circumstances where, although the rule applies, the terms of the rule have been complied with such that no penalty should be imposed. See, e.g., Dultz v. Velez, 726 F. Supp. 2d 480, 490 (D.N.J. 2010) ("conclu[ding] that § 1396p(c)(1) creates an individually enforceable right"); Aplin v. McCrossen, No. 12-CV-6312FPG, 2014 WL 4245985, at *20 (W.D.N.Y. Aug. 26, 2014) ("[C]ompliance with the federal transfer of assets statute is mandatory on the States and is enforceable under 42 U.S.C. § 1983."); cf. Johnson v. Guhl, 91 F. Supp. 2d 754, 770 (D.N.J. 2000) (holding that "§ 1396p(c)(2)(D) provides for a cause of action under § 1983").

The 2008 Bulletin does state that "[w]hen a person places funds in a trust, the person gives up ownership of those funds. Since the individual generally does not receive anything of comparable value in return, placing funds in a trust is usually a transfer for less than fair market value." 2008 Bulletin at 1 (emphasis added). But, read in context, that appears to be a general statement about trusts, and not a statement specific to pooled special needs trusts.

Consistent with Transmittal 64's definition, MDHHS's policy manual defines "fair market value" as "compensation received for the asset ... in a tangible form with intrinsic value that is equivalent to or greater than the value of the transferred asset" and provides that "[f]air market value must be received by the individual and not delivered at a future date." Maine Dep't of Health and Human Services, 10-144 Chapter 332, MaineCare Eligibility Manual, § 1.5 (Apr. 17, 2019) (emphasis added).